# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 17, 2009

## STATE OF TENNESSEE v. JOSHUA SHANE HAYES

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1092     Steve R. Dozier, Judge**

**No. M2008-01066-CCA-R3-CD - Filed August 18, 2010**

Following a jury trial, Defendant, Joshua Shane Hayes, was convicted of possession with intent to deliver three-hundred grams or more of cocaine (count one), manufacturing twenty or more marijuana plants (count two), and possession with intent to deliver more than ten pounds but less than seventy pounds of marijuana (count three). The trial court conducted a sentencing hearing and imposed a sentence of twenty-four years for count one, five years for count two, and four years for count three. The court ordered counts one and two to run consecutively to each other and concurrently to count three for an effective twenty-nine year sentence in the Department of Correction. On appeal, Defendant argues that (1) the trial court erred in failing to suppress the evidence seized from the residence at Deer Valley Trail; (2) that the trial court erred in allowing the State to introduce evidence of seventeen firearms, ammunition, and photographs of multiple firearms at trial; and (3) that the trial court erred in sentencing Defendant to an effective twenty-nine year sentence. Following our review of the record, we reverse the judgments of the trial court because the warrant does not comply with the requirements of Rule 41 of the Tennessee Rules of Criminal Procedure.

**Tenn. R. App. P. Appeal as of Right;**
**Judgment of the Criminal Court Reversed and Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Richard McGee and Kevin McGee, Nashville, Tennessee (on appeal); Erik R. Herbert, Nashville, Tennessee; Pal Lengyel-Leahu, Santa Monica, California; and Harry Christensen, Lebanon, Tennessee (at trial) for the appellant, Joshua Shane Hayes.

Robert E. Cooper, Jr., Attorney General and Reporter; Frank Borger Gilligan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; John Zimmerman,

Assistant District Attorney General; and Rachel Sobrero, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Suppression Hearing - November 17, 2006

Around 1:00 p.m. on September 12, 2005, Investigator Phillip Taylor of the Twentieth Judicial Drug Task Force and other officers executed a search warrant at 5613 Deer Valley Trail in Nashville. Before the warrant was executed, officers had followed Defendant from the house and subsequently stopped him and took him into custody. He was then brought back to the residence.

In the house, officers discovered a "grow operation" and recovered fifty-two marijuana plants. Some of the marijuana plants were being grown hydroponically in a jacuzzi bathtub in the master bathroom, and other plants were in a closet. Investigator Taylor explained that hydroponic marijuana is marijuana grown by artificial means through an indoor operation with a controlled environment. Officers also seized several bags of loose marijuana, bricks of marijuana, a safe containing marijuana, a lock box with four-hundred grams of cocaine, a second lock box containing ten-thousand five-hundred dollars, seven blue pills, five white oblong tablets, three white pills, two yellow oblong tablets, one cream-colored tablet, fifteen oblong white tablets, drug paraphernalia, assault weapons, handguns, shotguns, rifles, and ammunition. Investigator Taylor testified that fifteen of the pills seized were Alprozolam, a Schedule Four drug, and three tablets were Dihydro, a Schedule Three drug. He also said that some of the oblong tablets were in the shape of a football.

Detective Herbert Kajihara of the Twentieth Judicial District Drug Task Force testified that he prepared the affidavit for the search warrant and swore to its contents. According to the affidavit, Larry Reid, Joshua Meeks, and others were involved in an illegal operation, and Reid and Meeks had been the subject of a wiretap. As part of the facts supporting probable cause, Detective Kajihara made the following statement: "Larry Franklin Reid has a business associate named Josh (sic) Hayes, and he helps him with his illegal operation." Detective Kajihara also noted that "Reid and Hayes have a recording studio located at Two-Six-0-Six Grissom Drive." He further noted that "[i]llegal transactions occur at the studio." Detective Kajihara testified that Mr. Reid furnished the recording studio with equipment bought from another "dope dealer" that was co-mingled with Defendant's equipment. He also said that most of Mr. Reid's money came from drug trafficking. Detective Kajihara listed portions of intercepted calls between Reid and Defendant in the

search warrant affidavit. He testified that he had listened to each call and provided his interpretation in the affidavit of what was being said. Portions of the intercepted calls were then played for the jury, and Detective Kajihara testified concerning his interpretation of the calls. He said that as a result of information obtained from his investigation, he concluded that Defendant was conspiring with Mr. Reid to sell narcotics, which were being stored at 5613 Deer Valley Trail.

Detective Kajihara testified that while there were no specific references to narcotics in the conversations between Defendant and Mr. Reid, he said that Defendant was very intelligent and would speak only in code when talking on the phone. He noted that during one conversation, Mr. Reid mentioned marijuana, and defendant said, "you're saying that on the phone." In another conversation, Defendant told Reid not to mention "super good" on the phone. Detective Kajihara testified that based on his training and experience as a narcotics agent, everyone "talks in code" when referring to narcotics or other illegal activity. He testified that "stuff" is a code word for narcotics, and the word "hydro" refers to hydroponic marijuana. He said that Defendant and Reid also referred to hydroponic marijuana as "super good" and referred to marijuana as "good." He testified that "footballs" is a code for pills that are generally oval in shape, such as Alprazolam. Fifteen pills of Alprazolam were recovered from Defendant's residence during the search, which were in the shape of a football.

Detective Kajihara testified concerning specific examples of phone conversations between Defendant and Mr. Reid. In the search warrant affidavit, Detective Kajihara noted that "Decarlo Phifer comes to Nashville with his cousins to visit Larry Reid." He further noted:

> Josh Hayes holds stuff for Larry Reid. (Reid Call 10160, 10161, 10171, 615-533-9861), Reid calls Josh Hayes. Reid wants to come over and get stuff (Narcotics) for his brother Decarlo Phifer. Reid tells Hayes that he is bringing them over there to Hayes house (5613 Deer Valley Trail). Reid tells Hayes that he will have them sit outside and get it from Hayes. Reid will then give it to Phifer to carry in his car so that Reid won't have to carry it in his car, because Reid's kids are with him. Surveillance did observe this meet between Phifer and Reid and then Reid, Phifer and Hayes.

Detective Kajihara admitted that Defendant and Mr. Reid did not specifically use the word "stuff" and that it was his interpretation of what was happening based on the "whole picture." He further stated that after the conversation, Mr. Reid was observed leaving the Deer Valley residence with a package. Detective Kajihara testified that according to the wiretap reports,

Mr. Reid had previously informed Defendant that his brother (Decarlo Phifer) was coming to town and that every time Phifer came into town, he picked up narcotics.

Detective Kajihara testified that during a phone conversation on July 24, 2005, Defendant used the term "Hydros," which was referring to Hydroponic marijuana. He did not believe that Defendant was referring to hydrocodone. He explained that the street name for hydrocodone is "[f]ootballs, tabs," and he said that most people do not know the chemical name for them. Detective Kajihara testified that on August 17, 2005, Defendant called Mr. Reid and asked if he could get in contact with Hayes about the guy that has the footballs (pills). He did not believe that Defendant and Mr. Reid were referring to the Madden football game. During a conversation on August 18, 2005, Detective Kajihara testified that Defendant and Decarlo Phifer discussed prices and weight of narcotics. They also discussed money owed for drug sales. Detective Kajihara testified that Mr. Reid always called Defendant for money. It was his understanding that Defendant also held money for Reid in addition to the narcotics. He stated that Mr. Reid never went to the bank for money. He got it from Defendant.

Suppression Hearing Continued - January 26, 2007

Detective Kajihara testified that around 10:00 a.m. on September 12, 2005, he and seven other officers took seven search warrants to the Metro Center Courts, and Judge Faimon began signing them. Each search warrant had identical affidavits, and the affidavits were signed and sworn to in front of the judge. Detective Kajihara had already made three copies of each warrant, and a judge had to sign and date each copy. At some point, Judge Casey Moreland walked in, and Judge Faimon asked him to sign a couple of the search warrants. Detective Kajihara noted that Judge Moreland had previously signed the same warrants, but the names of the officers designated to execute the warrants had been changed because it was Detective Kajihara's belief at the time that the person going into the residence had to be present when the judge signed the warrant. Detective Kajihara then swore to the affidavits again in front of Judge Moreland. Detective Kajihara testified that Judge Faimon signed the warrant for the recording studio at 10:50 a.m. on September 12, 2005. He testified that Judge Moreland signed the warrant in the present case, and mistakenly wrote "p.m." rather than "a.m." on the copy of the warrant later given to Defendant. Detective Kajihara testified that Judge Moreland actually signed the warrant at 10:35 a.m., which was accurately reflected on the copy of the warrant retained by Judge Moreland.

Judge Casey Moreland testified that his copy of the search warrant in this case indicates that it was issued on September 12, 2005, at 10:35 **a.m**.(emphasis added). He acknowledged that he made a mistake and wrote 10:35 **p.m**. (emphasis added) on the original and on Defendant's copy. However, he had no doubt that the warrant was issued at 10:35

-4-

a.m. on September 12, 2005, because he and Judge Faimon would not have been in the office "at ten-thirty at night."

Trial

Investigator Phillip Taylor of the Twentieth Judicial District Drug Task Force obtained a wire tap order for Larry Reid that led to the investigation of Defendant. He then obtained a judicial order to establish a "pin register" on Defendant's phone. On September 12, 2005, Investigator Taylor conducted surveillance on Defendant and followed him from 5613 Deer Valley Trail to downtown Nashville where Defendant stopped at an area on "Seventeenth and Broad" and met with a female. Defendant was then taken into custody and transported back to the Deer Valley residence for execution of a search warrant. Investigator Taylor unlocked the front door with Defendant's key, and Defendant entered the code to disarm the alarm.

Upon entering the house, officers found a grow operation upstairs. Hydroponic marijuana was growing in a jacuzzi tub, and thirty-two small marijuana plants were growing in a closet in the spare bedroom. The windows had been taped and sealed, and grow lights and fans were being used in the operation to simulate outdoor growing conditions. Investigator Taylor testified that in his experience, tape on the windows prevents heat from escaping and also prevents someone from seeing the marijuana plants from outside. A total of fifty-two marijuana plants were seized from the residence. Officers also found $CO_2$ canisters, plant fertilizer, timers to control the environment, shrink-wrap for packaging marijuana, bowls, vacuum-seal bags, digital scales, and other paraphernalia. Several smaller amounts of marijuana were in various locations in the house, including a black safe, and there were two duffel bags containing several pounds of marijuana.

Officers found cocaine in a Brinks security box, and one Sentry safe contained $10,500 and assorted pills. The money was wrapped in rubber bands in various sized stacks. A key on a key ring with a remote which opened the doors on the 1998 Lincoln Town Car that Defendant had been driving was used to open the Brinks security box. Officers also found a copy of an insurance policy on the 1998 Lincoln Town Car and a 2002 Land Rover registered to Defendant at the Deer Valley Trail address. There was also a Comcast bill dated September 15, 2004, a Circuit City receipt dated July 1, 2004, and a Pet Meds receipt dated March 18, 2005, in Defendant's name at the same address. Defendant's photo album was in house. In one picture, Defendant appeared to be holding a ceramic pipe used to smoke marijuana, and in another picture, Defendant appeared to be rolling a marijuana joint. There was also a picture of Defendant holding a large martini glass with a marijuana bud in it. Police found an issue of High Times magazine in the residence and a book with a chapter on drugs and a chapter on electronics, sabotage, and surveillance.

Agent Scott Jones of the Twenty-First Judicial District Drug Task Force was asked by the Twentieth Judicial District Drug Task Force to assist in the investigation of Defendant and in executing the search warrant at 5613 Deer Valley Trail. He was assigned to search the middle bedroom of the residence. He also took photographs and drew a diagram of the residence.

In the bedroom, Agent Jones discovered various long guns, including assault rifles and shotguns, ammunition, and a multitude of handguns. Included in the weapons found was an AR15 assault rifle with an EO Tech "red dot scope" commonly used by special operations teams. Agent Jones also identified other weapons such as a "Mac Ninety," similar to an AK47, a "seven point six two by thirty-nine millimeter," a Mossberg twelve-gauge shotgun, a twelve-gauge shotgun with a pistol grip, a second AR15 assault rifle, a 30-30 lever rifle with scope, a wood grain rifle, a .40 caliber Glock-22, a Tech-9, a .45 caliber Glock-21 with a laser sight, a Smith and Wesson .38 revolver with five live rounds, a Raven .25 caliber revolver, a Browning .40 caliber handgun, a Charles Dailey .45 caliber handgun, an Auto Ordinance Corporation handgun, a Ruger P90, and a nine-millimeter assault pistol. Some of the guns were hidden in various locations in the room. Agent Jones testified that in his experience, handguns, long guns, and other weapons are commonly seen in homes where search warrants are being executed and drugs are being distributed. He said that the weapons are sometimes used for protection from other drug dealers or exchanged for narcotics.

Detective Herbert Kajihara of the Twentieth Judicial District Drug Task Force was the case officer in the investigation that led to Defendant's arrest. The investigation began in December of 2004 and lasted until September of 2005. Concerning the investigation, Detective Kajihara said, " Uh - -there was the - - the initial was the Byrd (phonetic) brothers that started with Larry Reid (Reed). From there it spun to the Adoundeth (phonetic) . . .Neesum . . . Adoundeth and his brother, David Neesum." He testified that Larry Reid was the target of a wire tap that began in April of 2005, and he estimated that he listened to more than ten thousands calls. During the interception of Reid's calls, Detective Kajihara heard Defendant's name. He then obtained Defendant's phone number and address and conducted surveillance. Detective Kajihara saw Defendant at the Deer Valley Trail address on more than one occasion, and he saw a truck at the residence registered to Defendant's brother. He also saw Defendant driving a Lincoln Town Car "numerous occasions during surveillance."

Through listening to Mr. Reid's phone calls and from other sources, Detective Kajihara learned that Mr. Reid had a brother named Decarlo Phifer who was expected to arrive in Nashville on July 12, 2005, to pick up some narcotics. On that date at 4:20 p.m., he intercepted a call between Defendant and Larry Reid. The call was played for the jury. Investigators also set up surveillance at Mr. Reid's house and observed Mr. Phifer arrive in a Cadillac with a North Carolina license plate. Investigators then followed Mr. Reid and Mr.

Phifer, who drove separate vehicles, to Hickory Hollow Mall. The two men were in the mall for a while, and Mr. Reid called Defendant. The call was intercepted by investigators. Mr. Reid and Mr. Phifer then left the mall, again in separate vehicles, and drove to Defendant's house at 5613 Deer Valley Drive located near the mall. Mr. Reid pulled in the drive way and parked next to Defendant's Lincoln Town Car, and Mr. Phifer and the two occupants of the Cadillac parked on the street. Mr. Phifer initially remained outside with Mr. Reid's child while Mr. Reid went inside the residence. After a while, Phifer then took the child inside the house. A short time later, Detective Kajihara saw Mr. Reid, Mr. Phifer, and Defendant walk out of the residence. He said that Mr. Phifer walked to the back of the Cadillac, and it appeared that he was holding something small in his hands. He then got into the car. Detective Kajihara acknowledged that he was too far away to tell what, if anything, that Phifer had in his hands.

Detective Kajihara testified that on September 12, 2005, a judge signed a search warrant for the residence at 5613 Deer Valley Trail. He was the affiant, and Philip Taylor was designated as the officer to execute the search warrant.. Detective Kajihara summarized the telephone calls in the affidavit and provided the judge with an interpretation of some of the calls. Although he was not present during the execution of the warrant at 5613 Deer Valley Trial, he examined the evidence seized from the location. Detective Kajihara testified that Defendant's brother, Jake Hayes, owned the residence. Jake Hayes was never observed at the residence, and no documents pertaining to anyone other than Defendant and Mr. Jake Hayes were found at the residence.

Detective Kajihara testified that a book was seized from the Deer Valley Trail residence with a chapter on "Electronic, Sabotage and Surveillance, Figure Eleven, Eaves 'Dropping." He explained that there was a section on wiretapping that instructed the reader not to say anything over the phone that could not be said to a police officer. Detective Kajihara testified that Defendant and Mr. Reid used code words for marijuana and cocaine when speaking over the phone. He said that there was evidence of hydroponic marijuana being grown in the residence. Detective Kajihara explained that hydroponic marijuana "is actually grown indoors and elevates the THC content in general terms, which raises the quality- - quality of the product so that you get a better high, basically, out of it." He said that hydroponic marijuana brings a greater price.

Detective Kajihara testified that he made the decision to obtain the search warrant on September 12, 2005, because:

> The group of individuals that we were working on - - uh - -
> actually was having a load coming in on . . . it's kind of hard to
> explain, but, uh - - on - - one part of it was coming in. Uh - - so,

we would have to actually execute and - - and arrest these people. Once we arrest these people - - then, we have to go down on those - - on those telephones that we're up on - - uh - - at which point, then, the seal - - the order is unsealed and the defense would get copies of - - of what we were doing.

He said that those individuals who were arriving with the "load" were associated with defendant.

On cross-examination, Detective Kajihara testified that the interception of Mr. Reid's calls began on April 18, 2005, and lasted until September 12, 2005. Other phones were also tapped; however, Defendant did not appear in anyone else's phone conversation. Detective Kajihara admitted that there was no evidence linking Defendant to any of the other "peripheral" individuals in the investigation. Detective Kajihara testified that Mr. Reid and Defendant were involved in a legitimate recording studio, and he listened to hundreds of conversations about mixing boards and artists arriving at the studio for "hip-hop records" and mixing songs. He admitted that the Deer Valley Trail residence was not on twenty-four-hour surveillance. He said that investigators began observing the residence after following Mr. Reid there. Detective Kajihara testified that he saw Defendant go in and out of the residence at 5613 Deer Valley Trail multiple times. Defendant's brother was not seen at the house. He said that Defendant and Mr. Reid talked in code during their conversations. Detective Kajihara testified that they did not mention cocaine in any of their conversations, and he did not "have a code for cocaine for them." He said that Defendant and Mr. Reid "talked about weed a lot or marijuana." This was based on his interpretation of words that they used for marijuana. Detective Kajihara admitted that "Hydro" has more than one meaning "unless you deal with narcotics."

Detective Kajihara testified that it was his understanding that Decarlo Phifer was coming to pick up drugs from Mr. Reid who was getting them from Defendant. He said that neither Mr. Reid nor Mr. Phifer was arrested at that time because it was a long term investigation. He estimated that the value of the cocaine seized from the Deer Valley Trail residence was $38,500, and the value of the marijuana was $44,000.

On redirect examination, Detective Kajihara testified that Mr. Reid was under indictment and had a pending trial for a hand to hand drug transaction in October of 2004 between him and Mr. Byrd. He said that Mr. Reid delivered "a Kilo and three pounds [marijuana] to an individual, two brothers, that were actually taken by [a] DEA Task Force officer and a DEA agent." A large amount of money was also recovered.

Detective Isaac Wood is a Metropolitan Nashville police officer assigned to the Twentieth Judicial District Drug Task Force. He participated in the investigation involving Defendant. On July 12, 2005, he videotaped activity around the Deer Valley Trail residence. The purpose of the video was to watch for anyone arriving there to pick up cocaine. Detective Wood also participated in the search warrants at other locations. He carried evidence from the Deer Valley Trail residence to the property room. Mary Wilhoite is a civilian employed by the Metropolitan Nashville Police Department, and she is assigned to the property and evidence section. In 2005 she was the custodian over the narcotics section. Ms. Wilhoite testified that she received the evidence in this case in a sealed condition. On September 21, 2005, she and Sergeant Sage took the evidence to the Tennessee Bureau of Investigation (TBI) laboratory.

Special Agent Donna Flowers is a forensic chemist at the TBI Crime Lab in Nashville, and she tested the evidence in the present case. She testified that the marijuana plants weighed 2.3 pounds, and plant material in a box weighed 17.3 pounds. Special Agent Flowers tested the plant material and determined that it was marijuana. She also tested four additional packages of plant material and determined that the material was marijuana. The total weight of the packages was 24.5 pounds. Special Agent Flowers testified that she received and tested ten bags of white powder and determined the powder to be cocaine. The total weight of the cocaine was 385.0 grams.

<u>Sentencing Hearing</u>

Detective Herbert Kajihara testified that it was his opinion that multiple statements in Defendant's presentence report were untrue. He said that a proffer took place on November 1, 2005, in the "DA's conference room here in Davidson County." Through Defendant's proffer, he learned that Defendant began dealing with Larry Reid in January or February of 2004. Defendant also told him that in 2004, Mike Byrd brought a duffel bag containing ten kilograms of cocaine to the recording studio on Whorley Drive for Mr. Reid to test. He then allowed them to store the cocaine over night in the studio. Defendant said that he had dealt with Mr. Reid and that the grow operation was in his house for his personal use. Detective Kajihara testified that Defendant had contact with others in the drug trade and talked about different people. One person was named Sam, and Defendant said that Mike Byrd, who had been indicted, was Mr. Reid's supplier. Defendant told Detective Kajihara that Mike and Shaun Byrd took him to a barn and showed him garbage bags of marijuana and asked if he wanted any. Defendant said that he declined the offer. During the proffer, Defendant said that Sam had dropped off the packages of dried marijuana found in his house and asked him to hold it, along with cocaine contained in two Crown Royal bags. Mr. Reid told Defendant that he would give him some "change" for holding the drugs. Detective Kajihara testified that the statements in the proffer contradicted the statement by Defendant

in the presence report indicating that there was no evidence that he actually possessed or sold drugs. Defendant made the statement that he had never been involved in outside criminal activity and that he did not know anyone involved prior to the execution of the search warrant. He further stated that he did not know Mr. Reid in any other way than socially and working in the business.

Detective Kajihara testified that Defendant then wanted to help himself out with the charges against him by becoming an informant against Mike Byrd. Defendant knew Mr. Byrd's contact information. He contacted Mr. Byrd and attempted to purchase a kilogram of cocaine. He eventually asked for a quarter of a kilogram. There were numerous phone calls, and a meeting was held. However, Defendant abruptly stopped and no longer wanted to help.

On cross-examination, Detective Kajihara acknowledged that Defendant was arrested in September of 2005, and he made a proffer admitting his "complicity" in the case on November 1, 2005. Defendant agreed to assist investigators by wearing a wire and making controlled purchases. Defendant told Detective Kajihara that his involvement in the illegal drug trade was minimal. Detective Kajihara acknowledged that Defendant never said he was involved in the exchange of money for drugs, and he did not find anything in Defendant's proffer to be untrue. He testified that Defendant assisted investigators for five months, but was unable to make a controlled buy. Detective Kajihara testified that investigators did obtain some information about Mr. Byrd and his supplier. Defendant then moved to Florida.

Darren Futch testified that he bonded Defendant out of jail on September 13, 2005. There had been no problems with Defendant's behavior since being released on bond, and he was not aware of Defendant missing any court dates.

Steve Fox testified that he has known Defendant for eleven years. Defendant was friends with his eldest son who is now deceased. He said that Defendant is a good and caring person who was there for Mr. Fox's family after his son died, and Defendant became like a son to him. According to Mr. Fox, Defendant would "own" up to things when he got into trouble. He did not know Defendant to lie or try to hide the truth. Mr. Fox did not feel that Defendant would break the law again, and he would be there to support Defendant. He testified that Defendant comes from a good and caring family who would support him, and he did not feel that Defendant would benefit from going to jail. He also said that Defendant had the "tools" to become successful.

Duane Hayes, Defendant's father, testified that his family had never been involved in anything like this. He said that Defendant always trusted anyone he became friends with, which sometimes got him in trouble. Mr. Hayes explained that Defendant worked his way

through college and ended up in Knoxville where he met Tim, Steve Fox's son. This led to an interest in music. Mr. Hayes testified that it was rough on Defendant when Tim was killed in an automobile accident. Defendant then decided to go to school in Orlando, Florida. After graduation, Defendant moved to Nashville and began the recording studio. He said that Defendant is a good person and not a hoodlum, criminal, or drug dealer. He felt that Defendant made the mistake of letting others influence him. Mr. Hayes did not believe that Defendant would have been on the street selling drugs. He felt that Defendant's desire to complete his recording studio may have affected his judgment with respect to holding drugs for someone else. Mr. Hayes had noticed many changes in Defendant after he left Nashville and moved back to Florida. Defendant now has a good job and a "great" fiancee.

On cross-examination, Mr. Hayes testified that he visited the Deer Valley Trail residence when Josh first bought it, and Defendant was living in the residence with Jake. He thought that Jake lived in the residence for a year and a half until he took a job in Boca Raton, Florida in June or July of 2005. Mr. Hayes did not know how long Defendant had been living at the residence when the search warrant was executed. He thought that Jake was going to sell the house, but he later made a deal for someone to rent it.

Sharon Hayes, Defendant's mother, testified that she visited the Deer Valley Trail residence in May of 2005. She and Defendant's father stayed in the upstairs bedroom, and she did not see any evidence of a drug operation. Mrs. Hayes testified that between the time Defendant graduated from music school until the time of his arrest, he kept in contact with her. She did not believe that he had a permanent address at the time. Mrs. Hayes explained that Defendant was a music engineer after graduating from "Full Sail (phonetic)" and was doing free lance work. She said that he did not have a permanent address, and he stayed with friends in Atlanta and Knoxville, and he also went to Nashville. Defendant decided that a music studio would do well in Nashville, and "he decided to set up the studio." Mrs. Hayes was not aware of any period of time during which Defendant and Jake lived together permanently. She thought that at some point, Defendant rented a house in Nashville.

Mrs. Hayes told the court that Defendant has a kind heart but met with "some very corrupt influences." She felt that his "biggest crime" was trusting the wrong people. She said that Defendant deeply regretted his involvement in the offenses. Mrs. Hayes testified that when Tim Fox died, Defendant went into a deep depression that lasted for about one year. Counseling was suggested, but Defendant would not seek treatment because he did not want to become dependant upon any type of drug. Mrs. Hayes testified that due to a combination of the painful loss and Defendant's youthful inexperience, he made some "extremely poor judgments." She said that Defendant moved away as soon as the criminal activity was discovered, and he realized how serious it was. Mrs. Hayes testified that

Defendant was employed until the day of trial. On cross-examination, Mrs. Hayes thought that Tim Fox died in March of 2001.

Defendant read a prepared statement to the court. He apologized to his family, his common law wife, the state, and the judge. He noted that he was embarrassed and ashamed to be sitting in court. Defendant said that he moved to Nashville in 2003 with the "best intentions" of a career in the music business. He explained that he got into the music business because of his friend, Tim Fox. Mr. Fox was killed in a traffic accident in March of 2001. Defendant said that he then decided to attend "Full Sail," the same school that Mr. Fox planned to attend. After he graduated in December of 2002, he remained there for a couple of months and took some graduate classes. Defendant then moved to Nashville where his brother, Jake, was living.

Defendant testified that his father helped him and Jake set up a wholesale furniture and mattress warehouse. He said, "the music business was almost like a side job for me at the time cause I needed some type of, you know, main income." Defendant said that he and Jake leased a location at 2606 Grissom Drive. Half of the location was used as the warehouse, and the other half was office space that Defendant planned to use as a means to set up the recording studio. At the time, Defendant said that he was living at 202 Whorley Road, and he had set up a "project studio" in the basement. He then met a music producer named "Kevin Grisham" who helped him book sessions and introduced him to Larry Reid. Defendant testified that he and Mr. Reid had many recording sessions, and they eventually became partners in a recording studio. The studio was completed in May of 2005.

Defendant acknowledged that he made some very bad decisions while in Nashville, but he was not the person that the State and the evidence made him out to be. He took full responsibility for his actions and said that he was not selling in September of 2005 or any other time. He also denied being a criminal. Defendant felt that he was rehabilitated and could be released into society. He testified that the video tape of Mr. Reid arriving at his house had nothing to do with any type of drugs. He claimed that Mr. Reid was there to pick up a key to the recording studio to take his children and brother there. Defendant did not see a package in anyone's hand.

Defendant testified that he agreed to assist law enforcement officers, including Detective Kajihara, and he told them everything that he knew. He also met with one of the suspects and made some phone calls in order to assist with the investigation. His attorney advised him to keep a journal of the calls. Defendant said that he did everything the officers asked of him, but he did not know the "target subject," Mike Byrd, very well and was unable to make a buy from him. He knew Mr. Byrd because he found out that Mr. Reid was buying equipment from him. Defendant testified that after his business was shut down and his

-12-

property was seized, he had no reason to remain in Nashville. In March of 2007, he took a job in Florida with medical and dental benefits in a "totally different field." If incarcerated, he would be in jeopardy of losing the job.

Defendant testified that his common law wife has a condition similar to epilepsy and takes daily medication for seizures. He said that her doctor indicated that she should not live alone. Defendant's mother and her mother stayed with her while Defendant was incarcerated. Defendant testified that he has remained free of any illegal activity since his charges in 2005, and he will "stay away from anything of that sort for the rest of [his] life."

Concerning his statement about not knowing anyone, Defendant said that he was not attempting to "bend the truth or lie to anyone or get around someone." He meant that he did not know anyone named in the indictment. He pointed out that Mike Byrd's name was not mentioned in the affidavit nor was he named in the indictment. Defendant admitted that he saw Mr. Byrd on one occasion with a duffel bag containing drugs. Because Mr. Byrd did not want to "ride" with the drugs, Defendant allowed him to leave the bag at the studio. Concerning his statement that there was no evidence to show that he sold or possessed drugs, Defendant said that he did not own the house at Deer Valley Trial, and he was not a permanent resident. He said that although he had access to the residence, he did not control what went on there. Defendant said that he knew the marijuana plants were being grown in the residence, but he did not control or posses them. However, he admitted that he assisted in growing the plants by watering them and changing the tanks. He said that his brother, Jake, owned the residence.

On cross-examination, Defendant denied telling Detective Kajihara that the marijuana plants were for his personal use. He testified that cable at the Deer Valley residence was in his name, and he assisted with the bill. Defendant said that his cell phone initially listed 202 Whorley Road as the address; however, he later had the bill forwarded to the Deer Valley Trail residence for two months. He testified that his car was registered to 202 Whorley Road, but the insurance statement was sent to the Deer Valley Trail address because he and his brother had a truck that was used for their business, and the insurance agent informed him that insurance for all of his vehicles should be registered to the same house. This included his wife's vehicle that was purchased on August 9, 2005. Defendant told the court that he did not have a permanent address in September of 2005 and that he sometimes stayed at the recording studio or at the Deer Valley residence. He said that he stayed at a hotel with his wife the night before the search warrant was executed. Defendant testified that he slept upstairs in the second bedroom when he stayed at the residence in August and September of 2005. He was aware of the gun collection in the house, and the guns belonged to him and his brother, Jake. He said they were all unloaded and purchased legally in Tennessee. He had no idea why some of the guns were hidden.

Defendant testified that he gave Detective Kajihara information about "Sam Balesteros," who brought duffel bags of marijuana to his house on Whorley Road. He acknowledged that he allowed Mr. Balesteros to break down the marijuana at that location, and Defendant received a portion of the drugs. Defendant testified that he told police about Decarlos Phifer, and he was at Mr. Reid's house when Reid had some cocaine. He acknowledged that he and Mr. Reid had conversations about "casual marijuana." Defendant could not answer where he obtained the marijuana that he gave to Mr. Reid, and he denied giving Mr. Reid any pills. He said that Mr. Reid left a bottle of prescription medication at the studio, which Defendant took home. Defendant told the trial court that most of the money found by officer in the Sentry safe was from the sale of inventory from Tennessee Wholesale Interiors. A portion of the funds also came from revenues of the recording studio. Defendant testified cocaine was brought to the house by Sam Balesteros for Defendant to hold for Mr. Reid.

Jake Hayes, Defendant's brother, was called as a rebuttal witness for the State. He testified that he owned the residence at 5613 Deer Valley Trail. Mr. Hayes was then advised by the trial court that he could be charged with the offense and that he had a right to consult with an attorney. He chose to assert his Fifth Amendment privilege and not answer any further questions.

## II. Motion to Suppress

Defendant argues that his pre-trial motion to suppress should have been granted because the search warrant failed to strictly comply with Rule 41(c) of the Tennessee Rules of Criminal Procedure. He further argues that the affidavit failed to provide probable cause because it failed to prove a nexus between illegal activity and the residence to be searched, the information in the affidavit establishing probable cause was stale, and the affidavit failed to provide specific facts establishing the affiant's basis of knowledge

*A. Standard of Review*

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn.2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn.2001). However, this court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn.1998). The application of the law to the facts found

by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn.2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Article I, section 7 of the Tennessee Constitution provides that:

> People shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Both of these constitutional provisions are intended to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930 (1967); *see also State v. Keith*, 978 S.W.2d 861, 865 (Tenn.1998).

*B.  Failure to Comply With Rule 41(c) of the Tennessee Rules of Criminal Procedure*

At the time the search warrant was issued in Defendant's case, Tennessee Rule of Criminal Procedure 41(c) stated in relevant part:

> The magistrate shall prepare an original and two exact copies of the search warrant, one of which shall be kept by the magistrate as a part of his or her official records, and one of which shall be left with the person or persons on whom the search warrant is served. The magistrate shall endorse upon the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution; and the exact copy of the search warrant and the

endorsement thereon shall be admissible evidence. Failure of the magistrate to make said original and two copies of the search warrant or failure to endorse thereon the date and time of issuance and the name of the officer to whom issued, or the failure of the serving officer where possible to leave a copy with the person or persons on whom the search warrant is being served, shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.

Tenn. R. Crim. P. 41(c). Rule 41 was reformatted effective July 1, 2006; however, there were no substantive changes.

In the present case, the warrant in question was signed by Judge Casey Moreland on September 12, 2005. Detective Kajihara had already made copies of the warrant, and the Judge had to sign and date each copy. Judge Moreland's copy of the warrant indicates that it was issued on September 12, 2005, at 10:35 **a.m.** (emphasis added).; however, the original and the other copy, which was given to Defendant, state that it was issued at 10:35 **p.m**. (emphasis added). The warrant was executed around 1:00 p.m. on September 12, 2005. At the suppression hearing, Judge Moreland testified that he had no doubt that he signed the warrant at 10:35 a.m. because he would not have been in the office "at ten-thirty at night." Detective Kajihara also testified that the warrant was signed at 10:35 a.m. on September 12, 2005.

Defendant contends that the judge failed to strictly comply with Rule 41(c) of the Tennessee Rules of Criminal Procedure because he wrote "p.m." instead of "a.m." on the original and one copy of the warrant. He argues that the warrant does not show that it was issued before it was executed, and the judge failed to retain an exact copy of the original search warrant. The State responds that the conflicting times represent a clerical error that did not prejudice Defendant.

With respect to Rule 41(c), in *State v. Coffee*, 54 S.W.3d 231, 233-34 (Tenn. 2001), the Tennessee Supreme Court reviewed the applicable law:

These procedural safeguards are intended "to secure the citizen against carelessness and abuse in the issuance and execution of search warrants." *Talley v. State*, 208 Tenn. 275, 345 S.W.2d 867, 869 (1961).

"There is no writ more calculated to be abused in its use than the search warrant, for with it any home may be entered and the inmates disturbed, humiliated, and degraded. To prevent such a possibility from false informants made to officers inspired by

-16-

> overzeal, or acting from expediency, or obeying the command
> uttered by a mob impulse, the provisions of the Constitution and
> statutes found force and command observance."

*Id*. (quoting *Hampton v. State*, 148 Tenn. 155, 252 S.W. 1007, 1008 (1923)). The provision at issue, that a magistrate prepare and retain a copy of the search warrant, endeavors to prevent improper searches and facilitate judicial review of whether a search was executed within the scope of the warrant. The rule achieves its goals in that a written record of the specifics of the search stifles the ever-present temptation for an officer to conduct a search and justify it later. Additionally, the copy of the warrant enables review of the original boundaries of a search; without an exact copy of the warrant, review is compromised because the critical facts and details of the warrant cannot be precisely determined. It is for these reasons that it is important to retain an exact copy of the warrant identifying the property or person to be searched, and it is for these same reasons that this requirement has been strictly enforced by our courts for many years. *See Talley*, 345 S.W.2d at 868; *State v. Brewer*, 989 S.W.2d 349, 353-54 (Tenn. Crim. App. 1997); *State v. Steele*, 894 S.W.2d 318, 319 (Tenn. Crim. App. 1994).

The Court further held: "As stated in *Talley*, "'Words could not be plainer, and [the procedural safeguards against abuse] are mandatory.'" (citation omitted). *Coffee*, 54 S.W.3d at 234.

In determining whether the search warrant in this case complied with Rule 41(c), the trial court, citing *State v. Powell*, No. W1999-01825-CCA-R3-CD, 2000 WL 633343 (Tenn. Crim. App. May 11, 2000) *no perm. app. filed*, held that "the mistaken 'PM' printed, by Judge Moreland, on the Defendant's warrant was not an omission, but was a clerical error." The court further held:

> The search warrant in this case was otherwise valid, and the Defendant was not
> prejudiced in any way by Judge Moreland's clerical error of placing a "PM"
> on the warrant instead of "AM." While the copies are not "exact," the Court
> of Criminal Appeals has recognized that no two documents are *exactly* the
> same. *See State v. Gambrel*, 783 S.W.2d 191 (Tenn. Crim. App. 1989).
> (emphasis added).

In *Powell*, a case decided in 2000, the judge who issued the search warrant wrote on the original warrant that it was issued "4-16-98" at 2:35 p.m. According to the testimony of Police Officer Lewis, who signed the affidavit in support of the search warrant, the warrant

was actually issued on April *17*, 1998, at 2:35 p.m. The search warrant was also executed on April 17, 1998, but the opinion does not state the time that the search was commenced. The significant fact was that the original affidavit showed that the affidavit was sworn to on April *17*, 1998; thus on the face of the documents was the clear indication that the search warrant was issued *before* the required affidavit was sworn to.

Further complicating the situation was that the date of April 17, 1998, was *typed* on the original warrant as the issuance date, even though the issuing judge hand wrote April *16*, 1998, elsewhere on the warrant. Also, while the original affidavit shows it was sworn to on April 17, 1998, the copy of the affidavit retained by the issuing judge shows it was sworn to on April 16, 1998. The court in *Powell* stated the issue was

> whether the discrepancy between the handwritten date endorsed by the judge and the date provided by Officer Lewis [and typed on the warrant prior to taking it to the judge] violates the provisions of Tenn. R. Crim. P. 41(c), thereby invalidating the warrant and the resulting search.

*Id.* at *3.

The court in *Powell* quoted that portion of Tenn. R. Crim. P. 41(c) relevant to the issue on appeal. As it pertains to our analysis of *Powell*, Rule 41(c) provides, "The magistrate *shall* endorse upon the search warrant *the* hour, date, and name of the officer to whom the warrant was delivered for execution; . . . Failure of the magistrate . . . to endorse [on the warrant] *the* date and time of issuance . . . shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure." (emphasis added).

Relying, in part, on previous unpublished cases of this Court, *State v. Johnny Lay*, No. 03C01-9606-CR-00174, 1994 WL 13387 (Tenn. Crim. App., Jan. 21, 1994) *no perm. app. filed* and *State v. Ralph Teague*, No. 03C01-9203-CR-93, 1992 WL 331038 (Tenn. Crim. App., Nov. 13, 1992) *no perm. app. filed*, the court in *Powell* made the following premise which led to its affirmance of the trial court's denial of the motion to suppress:

> Rule 41 expressly provides that an *omission* from the technical requirements results in an illegal search. The present case does not involve an *omission*, but rather a *clerical error*. (emphasis added).

*Powell*, at *3.

Thus the court in *Powell* held as follows:

Officer Lewis' testimony supports the conclusion that the handwritten date of April 16, 1998, was the result of a clerical error by the judge. No prejudice enured to [ ] appellant as a result of the clerical error. Accordingly, the incorrect date inscribed by the judge does not void the search warrant and the trial court correctly concluded that the warrant was valid.

*Id.*

We are constrained to conclude however, that the trial court's reliance on *Powell* in the case *sub judice* was misplaced. We conclude that the analysis of Tenn. R. Crim. P. 41(c) as solely a "rule of omission," as was done by the *Powell* court, is incorrect in light of subsequent decisions by our Supreme Court and from our own court.

In *State v. Bobadilla*, 181 S.W.3d 641 (Tenn. 2005), a magistrate issued a search warrant on May 13, 2003, to search the defendant's residence. The magistrate filled in the date that the search warrant was issued, but failed to state the hour that the warrant was issued. The trial court denied the defendant's motion to suppress, ruling that the warrant was executed on the same day it was issued and that the date of issuance and the name of the officer to whom the warrant was issued were endorsed on the search warrant making the warrant "supply all the things needed." *Id.* at 642. The Court of Criminal Appeals affirmed the trial court on grounds other than the merits of the search issue. The Supreme Court reversed, holding that the search and seizure were illegal pursuant to Tenn. R. Crim. P. 41(c). After quoting Rule 41(c), the Supreme Court emphasized, "[w]e have interpreted these rules strictly; the language is plain and the requirements are mandatory. *Coffee*, 54 S.W.3d at 233-34." *Bobadilla*, at 645. Specifically, the Supreme Court held,

The trial court is eminently correct in its rationale - that the pertinent part of Rule 41(c) is designed to ensure that if a search warrant is executed prior to its issuance, such discrepancy will be apparent on the face of the warrant. *Because the hour was not endorsed by the magistrate on the search warrant in this case, the warrant fails to explicitly show that it was issued - then executed. Therefore, the search warrant fails to meet the requirements as set forth in Tennessee Rule of Criminal Procedure 41(c).*

*Id.* (emphasis added).

We read *Bobadilla* to implicitly reject the "rule of omission" analysis found in *Powell*. First, as noted in *Bobadilla*, the primary purpose of the rule is to make sure that a search warrant is reviewed first by a magistrate, and then issued *before* any search takes place pursuant to authority of the search warrant. This requires in part that the time of the issuance

-19-

of the search warrant be set forth in the warrant. Logically, in order to ensure that the warrant is first issued, *then* executed, not only must the time be endorsed, but the *accurate* time must be endorsed.

In *State v. David Wayne Jones,* No. M2007-01163-CCA-R3-CD, 2008 WL 833956 (Tenn. Crim. App. Mar. 28, 2008) *no perm. app. filed*, the two defendants' home was searched pursuant to a search warrant. It was noted on the warrant that it was issued at "11:25," but there was no indication whether it was 11:25 *a.m.* or 11:25 *p.m.* Testimony at the suppression hearing by the officer who obtained and executed the search warrant was that the warrant was issued at 11:25 p.m. on March 2, 2005, and the search of defendants' residence began at 12:15 a.m. on March 3, 2005. The trial court denied the motions to suppress filed by each defendant. In doing so, the trial court found that "'the time being omitted from the search warrant was not problematic in **this** instance because the search warrant was executed on March 3, 2005[,] after being signed on March 2, 2005.'" *Id.* at *2 (emphasis in original).

This Court reversed the trial court's denial of the suppression motions. While the defendants contended that the omission of an a.m. or p.m. designation was the same as failure to endorse altogether the time of issuance, the State argued that since the evidence established that the warrant was issued first and then executed, the defendants were not entitled to relief.

Relying on *Bobadilla*, the Court of Criminal Appeals in *Jones* noted that "although the search warrant contains the endorsement of an hour, 11:25, it does not contain the endorsement of *the hour* of its issuance." *Jones* at *3 (emphasis in original). Hence, the court concluded that not only must a time be endorsed, but also the correct and accurate time must be endorsed. The *Jones* Court noted:

Because there was no designation of whether the warrant was issued at 11:25 a.m. or 11:25 p.m., the warrant fails to comply with the mandatory requirement of Rule 41 that it be endorsed with the hour of its issuance. Because of this deficiency, the warrant was invalid, and the resulting search was illegal. Consequently, the evidence seized pursuant to the warrant must be suppressed.

*Id.*

The *Jones* Court was compelled by the ruling in *Bobadilla* to reach this result notwithstanding the fact that the search warrant was issued before it was executed. *Jones*, at *4.

-20-

In *State v. Patrick Daniels*, No. W2008-00254-CCA-R10-CD, 2009 WL 2393113 (Tenn. Crim. App., Aug. 5, 2000), the defendant appealed the trial court's denial of his motion to suppress pursuant to Tenn. R. App. P. 10 . Defendant argued that he was entitled to relief because the search warrant, pursuant to which all physical evidence in the drug charge against him was seized, did not comply with the strict standards of Tenn. R. Crim. P. 41(c).

The facts in *Daniels* are remarkably similar to the case *sub judice*. The parties stipulated that the search warrant was issued at 10:35 a.m. on December 2, 2005, and that the issuing magistrate circled "p.m." instead of "a.m." when he endorsed the time of issuance upon the warrant. The search warrant was subsequently executed, and defendant was consequently arrested, with the arrest warrant being filed at 5:38 p.m. on December 2.

The trial court found there was no prejudice to the defendant by the magistrate erroneously circling "p.m." rather than "a.m.," and that the error did not "compromise the integrity of the search and did not 'undercut the purposes [Tenn. R. Crim. P.] 41(c) is designed to serve.'" *Id*. at *1. Relying upon *Bobadilla* and *Jones*, the court in *Daniels* reversed the trial court and suppressed the evidence pursuant to Tenn. R. Crim. P. 41(c). Notwithstanding the fact that the trial court ruled that a "good faith exception" to Tenn. R. Crim. P. 41(c) could cure the error made by the issuing magistrate, this Court concluded that "our Supreme Court has not recognized a good faith exception to the procedural safeguards in Rule 41(c), and we are constrained to follow the rule's mandate." *Id.*

Accordingly, this Court concluded that,

> By *erroneously circling "p.m.*," the magistrate endorsed the warrant with a *time later than it was executed* in violation of the rule's express language and the rule's purpose. Accordingly, we are compelled to reverse the trial court's order denying the appellant's motion to suppress.

*Id*. at *3 (emphasis added).

Based upon *Bobadilla*, *Jones*, and *Daniels*, we conclude that the pertinent part of Tenn. R. Crim. P. 41 is not a "rule of omission;" that is, it is not a situation where the sanctions apply *only* if the date and/or time of issuance of the warrant is omitted. The integral purpose of Rule 41 is to ensure that a search warrant is first issued, then executed. Accordingly, the requirement that the date and time of issuance shall be endorsed implicitly means that the *correct* date and time shall be endorsed. Thus, the search warrant in this case failed to comply with the requirements of Rule 41 and the motion to suppress must be granted.

Defendant further argues that the warrant in this case fails to comply with Tenn. R. Crim. P. 41(c) because the judge failed to hand deliver the search warrant to the executing officer. However, as pointed out by the State, this issue is waived because Defendant has raised it for the first time on appeal and failed to present any proof as to this allegation. Tenn. R. Crim. P. 12(b); Tenn. R. App. P. 36(a); *State v. Maddin*, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005)( "When an issue is raised for the first time on appeal, it is typically waived.").

## C. The Staleness and Nexus Arguments

Defendant next contends that the search warrant lacked probable cause because the State failed to show a sufficient nexus between the criminal activity and defendant's residence. He further contends that the information contained in the affidavit was stale.

Under both the Fourth Amendment to the United States Constitution and Article I, section 7, of the Tennessee constitution, no warrant may be issued except "upon probable cause supported by oath or affirmation." The Fourth Amendment warrant requirement demands that a probable cause determination be made by a neutral and detached magistrate. *State v. Valentine*, 911 S.W.2d 328, 330 (Tenn. 1995); *State v. Jacumin*, 778 S.W.2d 430, 431 (Tenn. 1989); *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). Probable cause has generally been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *State v. Johnson*, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993). If probable cause is absent, the magistrate is not empowered to issue a warrant. When reviewing the issuance of a search warrant, this Court must determine whether the magistrate had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing. *Jacumin*, at 432 (citations omitted). "[I]n passing on the validity of a warrant, the reviewing court may consider *only* the information brought to the magistrate's attention." *Jacumin*, 778 S.W.2d at 431-32. We may not consider any evidence that was not included in the affidavit but was known by the affiant or provided to or possessed by the issuing magistrate. *State v. Carter*, 160 S.W.3d 526, 533 (Tenn.2005); *State v. Henning*, 975 S.W.2d 290, 295 (Tenn.1998). The magistrate's judgment is entitled to great deference on appeal. *Jacumin*, 778 S.W.2d at 431-32.

To establish probable cause an affidavit must set forth facts from which a reasonable conclusion may be drawn that the evidence will be found in the place for which the warrant authorizes a search. *State v. Vann*, 976 S.W.2d 93, 105 (Tenn.1998); *State v. Longstreet*, 619 S.W.2d 97, 99 (Tenn.1981). The facts which connect a crime or criminal activity to the premises to be searched are critical and must be included in an affidavit for a search warrant. *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S. Ct. 1970, 56 L. Ed. 2d 525; *State v. Baker*, 625 S.W.2d 724, 726, (Tenn. Crim. App. 1981), *overruled on other grounds by State*

*v. Holt*, 691 S.W.2d 520 (Tenn. 1984); see *generally*, 2 W.LaFave, *Search and Seizure*, 3.7(d) (2d ed. 1987 and Supp. 1995). The affidavit must establish a nexus between the place of the search and the items sought to be found. The "type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence" may establish that connection. *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993).

The affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. *Vann*, 976 S.W.2d at 105. While the lapse of time between the commission of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause is a case-by-case determination. *State v. Meeks*, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993). In making this determination, courts should consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct. *State v. Reid*, 164 S.W.3d 286, 327 (Tenn. 2005). Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence. *State v. Dellinger*, 79 S.W.3d 458, 469-70 (Tenn. 2002); *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993).

In the affidavit Detective Kajihara set forth information establishing that Larry Reid and Joshua Lee Meeks were involved in a drug operation and the subjects of a wiretap. During an approximate six-month long investigation, numerous calls were intercepted, some of which involved Defendant and his residence. In the "Statement of Facts In Support of Probable Cause," Detective Kajihara stated: "Larry Franklin Reid has a business associate named Joshua Shane Hayes (m/w, DOB 9/25/76) that helps Reid with his illegal operation. Reid and Hayes have a recording studio located at 2606 Grissom Drive. Illegal Transactions occur at the studio." The pertinent parts of the affidavit with respect to the intercepted telephone calls involving Defendant are as follows:

1. On 4/20/05, (Reid Call 4569, 615-533-9861) Reid called Hayes and asked when he is going' to be back so Reid can get that CD with the beats and so Reid can celebrate. Hayes asked if he took the test. Reid said that the PO (Probation Officer) is giving Reid thirty days to clean up, Reid said that he is going to smoke for ten days and then he is going to be clean. Reid needs Hayes to write some checks to Reid because he needs proof that he works at the studio. Reid said that they (PO) aren't going to let Reid work there anymore. Hayes is telling Reid that he will write a check to Reid out of the bread and butter account every month. Reid told Hayes that he needs to relieve some serious stress. Reid said that he has been in the gym sweating everything out. Reid said that his PO told him not to go to the club. Reid said that he is

-23-

going to give himself twenty days to clean up. Reid said that his PO is a jerk. Reid said that he was thinking about putting a price on his PO. Reid said that no probation officer has ever fucked with him like this. Reid is talking about his old Probation Officer that was female, never made him take a piss test. Jacob Hayes (M/W, DOB 4/10/79) has the Electric Service at 2606 Grissom Drive. This is the location of Larry Reid's recording studio. Josh Hayes is partners with Larry Reid. Josh Hayes lives at 5613 Deer Valley Drive, Antioch Tennessee. 5613 Deer Valley Drive is owned by Jacob Hayes. Jacob Hayes is Joshua Shane Hayes brother.

2. On 7/11/05, Decarlo Phifer comes to Nashville with his cousins to visit Larry Reid. Surveillance did observe Phifer in a Cadillac Deville. Josh Hayes holds stuff for Larry Reid. (Reid call 10160, 10161, 10171, 615-533-9861), Reid calls Josh Hayes. Reid wants to come over and get stuff (Narcotics) for his brother Decarlo Phifer. Reid tells Hayes that he his bringing them over there to Hayes house (5613 Deer Valley Trail). Reid tells Hayes that he will have them sit outside and get it from Hayes. Reid will then give it to Phifer to carry in his car so that Reid won't have to carry it in his car because Reid's kids are with him. Surveillance did observe this meet between Phifer and Reid and then Reid, Phifer and Hayes.

3. On 7/24/05, (Reid Call 11346, 615-533-9861), Reid calls Josh Hayes. They talk about business at the studio and then Hayes starts talking about Hydroponics Marijuana. Hayes tells Reid that he has one left from what Reid had left him. Reid tells Hayes to bring it with him.

4. On 8/5/05, (Reid Call 12237, 615-533-9861), Reid calls Josh Hayes. They talk and Hayes tells Reid that he had to go ahead and do that to pay the bills because there was only $230.00 in the studio account and then Reid tells Hayes that he needs to get whatever is left.

5. On 8/8/05, (Reid Call 12476, 615-533-9861), Reid calls Josh Hayes. Reid tells Hayes that he wanted him to look at the good (Marijuana). Reid tells Hayes that it is better that his guys stuff. Hayes tells Reid that he needs to save some, because he is out of town.

6. On 8/9/05, (Reid Call 12545, 615-533-9861), Josh Hayes calls Larry Reid. Hayes tells Reid about his air conditioning at his house is broken. Reid tells Hayes about the Super Good (Marijuana) that Reid has with him.

7. On 8/17/05, (Reid Call 12850, 615-533-9861), Josh Hayes calls Larry Reid. Hayes asks Reid if he could get in contact with Hayes guy that has the footballs (pills).

8. On 8/18/05, (Reid Call 12943, 615-533-9861), Josh Hayes calls Larry Reid. Reid tells Hayes that he is coming to his house and wanted to make sure that everything is straight.

9. On 8/25/05, (Reid Call 14219, 615-533-9861), Josh Hayes calls Larry Reid. Reid asks if he got any off that? Hayes tells Reid that he needs to come and get them or he is going to take them back. Reid wants to know if Hayes has some feta (Money) for him. Hayes does but he also has to wait till dude gets back from the beach and that's when Hayes will get the rest of it. Hayes has Reid 65 and it's been there forever.

10. On 8/26/05, (Reid Call 14259, 615-533-9861), Josh Hayes calls Larry Reid. Reid tells Hayes that he needs to get the money from Hayes. Reid tells Hayes that he wants to bring it to the studio, because needs it do something with it. Hayes tells Reid that he will bring it in about an hour. Reid wants Hayes to bring some good (Marijuana). Call 14294, Hayes tells Reid that he be at the studio in 5 minutes.

11. On 8/26/05, (Reid Call 14302, 615-533-9861), Josh Meeks calls Larry Reid. Meeks calls Reid and tells him that he is on the way.

12. On 9/1/05, (Reid Call 14920, 615-533-9861), Josh Hayes calls Larry Reid. Reid tells Hayes that he needs to get $500.00 from him to send to his mother. Reid tells Hayes that he will come over to Hayes house and get it.

In the affidavit, Detective Kajihara noted that based on his training and experience, he had learned that "[n]arcotics dealers use a large vocabulary of terms to disguise their illegal operations." He then provided interpretations of the language used during the calls. Coded references to drugs were repeatedly made by Defendant and Mr. Reid such as "stuff," which Detective Kajihara interpreted to mean narcotics, and "good" and "super good" referring to marijuana. There was also a conversation in which Defendant was talking about "Hydroponics marijuana," and there are references to "footballs" or pills. In one of the calls on July 11, 2005, Mr. Reid wanted to come over to Defendant's residence to get "stuff" or narcotics for his brother, Decarlos Phifer. This meeting was later observed by surveillance. In our view, these calls reveal conversations between Defendant and Larry Reid about drug activity and show a sufficient nexus between the criminal activity and Defendant's residence.

-25-

Furthermore, these calls show that the information contained in the affidavit establishing a nexus between the criminal activity and Defendant's residence was not stale. If the illegal activity is described as ongoing, it is generally held that the affidavit does not become stale with the passage of time. *State v. Stepherson*, 15 S.W.3d 898, 903 (Tenn. Crim. App. 1999); *State v. Thomas*, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991). Depending upon the circumstances, sales of drugs can be an ongoing activity. *See State v. Conaster*, 958 S.W.2d 357, 361 (Tenn. Crim. App. 1997). In this case, there was continuous contact and references to illegal drug activity between Mr. Reid and Defendant from April 20, 2005, until September 1, 2005. The search warrant was issued on September 12, 2005. Several of those references to illegal activity occurred after the transaction at Defendant's residence on July 11, 2005. Since there was ongoing criminal activity in this case, the information in the affidavit was not stale.

## D. Basis of Knowledge

Defendant argues that the search warrant affidavit fails to establish the basis for Detective Kajihara's knowledge of the criminal activity. In *Jacumin*, our Supreme court adopted a two-pronged standard for determining whether probable cause exists under the circumstances presented in the affidavit submitted to the magistrate. In doing so, the Court relied upon the authority of *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969) and expressly rejected the "totality of the circumstances" approach found in *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). *Jacumin*, 778 S.W.2d at 436. The *Jacumin* court indicated that the two-pronged standard should not be applied "hypertechnically." *Id.*

When the affiant relies upon hearsay information from a confidential informant, the magistrate must be convinced that: (1) the informant possesses a "basis of knowledge" concerning the reported events and (2) that the veracity of the information is not in question. *Id.* at 432; *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). In order to meet the first prong of this standard, the affiant must inform the magistrate of some of the underlying circumstances which led to the informant's knowledge. *Moon*, 841 S.W.2d at 338. As for the second prong, the magistrate must be informed of some of the underlying circumstances from which the affiant concluded that the informant was credible and/or his information was reliable. *Id.* The affidavit must contain more than merely conclusory allegations. *Id.* Review of the affidavit "begins by measuring its contents under the two-pronged test in a common-sense, nonhypertechnical fashion." *Moon*, 841 S.W.2d at 339.

In *Moon*, this Court noted:

Actually, the two-pronged test for probable cause could apply to all search warrants. For example, even if the information in an affidavit stems from the affiant's firsthand knowledge, a magistrate would issue a warrant upon some determination of the basis of knowledge and veracity of the affiant. As a practical matter, though, the reliability of the investigating officer/affiant may be presumed by a magistrate, as may be the reliability of other investigating officers upon whom the affiant relies. *See e.g.*, *United States v. Ventresca*, *supra*; *United States v. Kirk*, 781 F.2d 198 (11ᵗʰ Cir. 1986). Thus, no special showing of reliability is necessary when the information comes from such an officer.

*Moon*, 841 S.W.2d at 338 n.1. Citing *Moon*, this Court in *State v. Robert Lee Archibald*, No. M2009-00545-CCA-R3-CD, 2010 WL 521030 at *3 (Tenn. Crim. App. Feb. 12, 2010) *perm. app. pending*, held: "These factors are largely irrelevant in the present case, however, because Det. Wilson's affidavit contains only his personal observations rather than information obtained from his CI. A magistrate may assume an officer's reliability." Likewise, in the present case, because the affidavit contains only Detective Kajihara's personal observations rather than information from a confidential informant, the judge may assume the officer's reliability. We thus consider the officer's "basis of knowledge."

In the affidavit, Detective Kajihara noted that he has twelve years of law enforcement experience, and he was assigned to the "narcotics Section of the Metro Nashville Vice Division for 4 years." He was assigned as a drug enforcement investigator with the 20th Judicial Drug Task Force on February 1, 2003, and he is a graduate of the "Drug Enforcement Administration's two week Basic Narcotics Investigator School." Detective Kajihara noted that he has participated in the execution of more than two-hundred search warrants "where the subject of the search has been an investigation into narcotics trafficking." He further noted that he had learned that "Narcotics Dealers use a large vocabulary of terms to disguise their illegal operations," and he was aware of the "habits, characteristics, and practices of drug traffickers, racketeers, money launderers, weapons violators, and their organizations. . ."

The affidavit shows that Detective Kajihara was involved in an investigation of a drug operation that involved several individuals, two of which were under a "State interception of Wire and Electronics Communications (Title III) Investigation," and the calls involving Defendant were part of the larger operation. The intercepted calls listed in the affidavit began on April 20, 2005, and continued until September 5, 2005. As previously discussed, in those calls involving Defendant, he was recorded discussing "stuff," which Detective Kajihara interpreted to mean narcotics, and "good" and "super good" referring to marijuana. There was also a conversation in which Defendant was talking about "hydro," or hydroponics

marijuana, and there are references to "footballs" or pills. In one of the calls on July 11, 2005, Mr. Reid wanted to come over to Defendant's residence to get "stuff" or narcotics for his brother, Decarlos Phifer. This meeting was later observed by surveillance. There are also discussions about money or "feta."

In this case, we conclude that the affidavit, read in its entirety, is sufficient to establish the basis for Detective Kajihara's knowledge. Therefore, the judge had a substantial basis for concluding that narcotics would be present at Defendant's residence. This issue is without merit.

## III. Introduction of Firearms

Defendant argues that the trial court erred by allowing the State to introduce seventeen firearms, photographs of multiple firearms, and ammunition into evidence at trial. He contends that since the State dropped the unlawful possession of a firearm charge, the evidence was irrelevant and unfairly prejudicial. Defendant further argues that even if the guns were relevant to an issue at trial, the probative value was outweighed by unfair prejudice. We disagree.

Tennessee Rule of Evidence 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)).

In this case, the State was required to prove that Defendant "knowingly possess[ed] a controlled substance with the intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4). It is permissible for the jury to infer "from the amount of a controlled substance or substances possessed by an offender, *along with other relevant facts surrounding the arrest*, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419 (Emphasis added); *see also State v. Willie Earl Kyles, Jr.*, No. W2001-01931-CCA-R3-CD, 2002 WL 927604, at *2 (Tenn. Crim. App., at Jackson, May 3, 2002), *perm. appeal denied* (Tenn. Oct. 21, 2002) (concluding that jury could infer possession of drugs with intent to sell

or deliver from the amount of drugs and circumstances surrounding the defendant's arrest).

> Relevant facts have been found, for instance, to include money in small denominations, beepers, loaded guns, the packaging of drugs in separate plastic bags, and Crown Royal bags used to hide drugs. *See State v. Timothy Tyrone Sanders*, No. M2001-02128-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Nashville, July 5, 2002), *perm. app. denied* (Tenn.2002); *State v. Reginald T. Smith*, No. 02-C-01-9204, slip op. at 3-4 (Tenn. Crim. App., Jackson, Feb. 17, 1993). The testimony of officers about differences between users and sellers, based upon experiences in the field, also has been found appropriate. *See State v. Timothy Murrell*, No. W2001-02279-CCA-R3-CD, slip op. at 5-9 (Tenn. Crim. App., Jackson, July 2, 2003) (collecting and discussing cases and articles upholding admissibility of police testimony about the habits of drug dealers if witness is qualified through experience or other means).

*State v. Thaddaeus Medford*, No. W2002-00226-CCA-R3-CD, 2003 WL 22446575 at *10 (Tenn. Crim. App. Oct. 21, 2003) *perm. app. denied* (Tenn. Mar. 22, 2004).

At trial, Defendant objected to the testimony by Agent Scott Jones concerning guns found during the search of Defendant's residence. Agent Jones testified that he had fourteen years of law enforcement experience, eight of which involved narcotics investigations. The following exchange then took place:

| [State]: | Based on your experience . . . what is a . . relevance of a gun during a drug investigation? |
|---|---|
| [Agent Jones]: | Uh - - could be a number of possibilities. Uh - - could be used for enforcement to keep - - |
| [State]: | What do you mean by enforcement? |
| [Agent Jones]: | Uh- - could be used to protect - - uh - - their - - their - - uh - - the sale of their product from other individuals that are coming in to take - - to take their drugs from them. Uh - - it - -it's common - - uh - - it's very common to see handguns, long guns . . . other weapons in homes where we have done numerous, numerous drug search warrants, just as protection from - - uh - - other - - other drug dealers, other people who come to hang out. |

We've also seen in many different instances that are trade-ins that have been brought in or stolen that are that are used for trade-ins for - - uh- - in exchange for narcotics.

[State]:             In your experience in your number of years in law enforcement, have you been in homes for search warrants or other circumstances where you later learned drugs were being distributed, where you did find weapons?

[Agent Jones]:       Yes.

The trial court overruled Defendant's objection and allowed Agent Jones to testify concerning the weapons. Agent Scott Jones testified that in the master bedroom, he discovered long guns, assault rifles, shotguns, ammunition, and a multitude of handguns. The State introduced seventeen of the guns into evidence, and there were eight pictures of various firearms and ammunition found during the search. Some of the guns were in duffel bags in the closet, and others were also tucked in various compartments in and around the bed. Agent Jones testified that he also found a Smith and Wesson thirty-eight revolver with five rounds in it lying on a table in plain view in a room next to the bedroom.

The evidence concerning the weapons found in Defendant's residence was relevant to support Defendant's convictions for possession with intent to deliver three-hundred grams or more of cocaine, possession with intent to deliver more than ten pounds but less than seventy pounds of marijuana, and manufacturing twenty or more marijuana plants . Based on our review, we conclude that the trial court did nor err in admitting the weapons into evidence.

Even assuming the evidence was admitted in error, we conclude that any error would be harmless. The evidence against Defendant was overwhelming. In addition to the guns, officers found hydroponic marijuana growing in a jacuzzi tub, and thirty-two small marijuana plants were growing in a closet in the spare bedroom upstairs. The windows had been taped and sealed, and grow lights and fans were being used in the operation to simulate outdoor growing conditions. A total of fifty-two marijuana plants were seized from the residence. Officers also found $CO_2$ canisters, plant fertilizer, timers to control the environment, shrink-wrap for packaging marijuana, bowls, vacuum-seal bags, digital scales, and other paraphernalia. Several smaller amounts of marijuana were in various locations in the house, including a black safe, and there were two duffel bags containing several pounds of marijuana. Officers also found cocaine in a Brinks security box, and one Sentury safe

-30-

contained $10,500 and assorted pills. The money was wrapped in rubber bands in various sized stacks. Defendant is not entitled to relief on this issue.

## IV. Sentencing Issues

Defendant was convicted of possession with intent to deliver three-hundred grams or more of cocaine, a Class A felony , manufacturing twenty or more marijuana plants, a Class C felony, and possession with intent to deliver more than ten pounds but less than seventy pounds of marijuana, a Class D felony. As a Range I, standard offender, Defendant is subject to a sentence range of between fifteen and twenty-five years for the possession of cocaine charge; three and six years for the manufacturing charge; and two and four years for the possession of marijuana charge. T.C.A. § 40-35-112(a)(1)-(4). The trial court applied the following enhancement factors: the Defendant has a previous  history of criminal convictions or criminal behavior; and the Defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. T.C.A. § 40-35-114(1), (9). The trial court placed "great weight on these enhancement factors in making the sentencing determination." The trial court rejected the six mitigating factors submitted by Defendant. Based on the presence of two enhancement factors and the great weight attributed to these factors, the trial court sentenced Defendant, as a Range One, standard offender, to twenty-four years for the possession of cocaine charge (count one); five years for the manufacturing charge (count two); and four years for the possession of marijuana charge (count three). The court ordered counts one and two to be served consecutively with each other and concurrently to count three for an effective twenty-nine year sentence.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett,* 49 S.W.3d 250, 257 (Tenn.2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, " 'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.' "*State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 Tenn.1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo.  Carter*, 254 S.W.3d at 345 (quoting *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004); *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App.1992)).

*A.  Length of Sentence*

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346.  Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the Defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn.2002).

In this case, Defendant argues that his sentence is excessive as to his conviction in count one for possession with intent to deliver three-hundred grams or more of cocaine.  He contends that the record does not support the two enhancement factors applied by the trial court and that the court failed to consider the mitigating factors.

In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find

that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id.*, 254 S.W.3d at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

The record reflects that the trial court considered the evidence presented at the suppression hearing, the trial, and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment. The trial court assigned great weight to Defendant's prior criminal history. In considering this particular factor, the court noted:

> Testimony presented at the sentencing hearing [was] that he began dealing with the target defendant (Larry Reid) in January 2004 and held quantities of up to 10 kilos of cocaine for Mr. Reid. Further, the defendant acknowledges in his pre-sentence report that he has used illegal drugs for approximately 15 years. Detective Kajihara testified about numerous incidents at the suppression hearing which indicate the defendant for months was involved in illegal drug trafficking in this jurisdiction. On one particular occasion, the defendant told Larry Reid not to say "dope" on the phone, was requested to "bring it" when discussing items that were "super good" and made references according to the testimony that indicated drug involvement.

In considering Defendant's use of firearms during the commission of the offenses, the trial court noted that the trial testimony established that seventeen firearms were found in various locations around Defendant's residence. At trial, Agent Jones testified that he found a Smith and Wesson thirty-eight revolver with five rounds in it lying on a table in plain view in the recreation room.

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due

consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the two enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of twenty-four years for possession with intent to deliver three-hundred grams or more of cocaine. Defendant is not entitled to relief on this issue.

## B. *Consecutive Sentencing*

Defendant contends that the trial court erred in ordering counts one and two to be served consecutively. More specifically, he argues that his criminal record is not so extensive as to warrant consecutive sentences. A trial court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b); *See also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The length of the sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2). Whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court. *State v. Hastings*, 25 S.W.2d 178, 181 (Tenn. Crim. App. 1999).

In this case, the trial court found that consecutive sentencing was appropriate based on factor (2) and explained its reasoning as follows: "The Court finds the defendant is an offender whose record of criminal activity is extensive. T.C.A. § 40-35-115. The Court has discussed at length the defendant's involvement in the illegal drug business within the Court's jurisdiction . . ." In considering the applicable enhancement factors, the trial court had previously noted that "for months Defendant was involved in illegal drug trafficking in this jurisdiction." The court pointed out that at the sentencing hearing, there was testimony that Defendant began dealing with Larry Reid in January of 2004 and "held quantities of up to 10 kilos of cocaine for Mr. Reid." The trial court further noted that Defendant acknowledged in the presentence report that "he had used illegal drugs for approximately 15 years." Concerning Defendant's prior alcohol and drug use, the presentence report contains the following:

> Defendant states first use of alcohol was age 16 and most recent use just before the trial. He states he typically drank 1 or two drinks a couple of times a week. He was sober all the time. It caused no problems. Reason for quitting is incarceration; He says he is a social drinker (He did get drunk in college).

> Drug use consisted of marijuana which he first used at age 17. He said it was not a habit, just social use. Most recent use was 2 ½ to 3 years ago.

In addition to Defendant's criminal activity, the trial court essentially found that Defendant was not credible and failed to accept responsibility for his actions. The court stated:

> The defendant's testimony at the sentencing hearing minimized his role in *any* drug activity. That testimony differed from the proffer he gave to the state prior to trial and differed from the testimony of the defendant's father. The defendant's father testified that the defendant's brother had moved out of the residence in June or July 2005, which places the defendant in sole possession of the residence and its contents. The Court has previously discussed numerous other factors that confirm this conclusion. The trial testimony documented the assorted illegal items found throughout the house including

-35-

potted marijuana plants, money, and firearms. This evidence is not consistent with the defendant's supposed forthright testimony at the sentencing hearing. The defendant testified that he was "not a criminal today" and had "nothing to do with the drugs," but his testimony is inconsistent and illogical with the circumstantial proof presented at trial, and moreover, is contrary to his proffer given to the state.

Detective Kajihara's testimony concerning the proffer differed greatly from the defendant's testimony at the sentencing hearing. The Court finds that the inconsistency is not a simple misunderstanding of how the defendant interpreted the language of the search warrant and/or indictment, as the defense attorney argued, but rather a blatant attempt to mislead the Court as to the extent of the defendant's involvement with this drug activity. Without question the defendant "possessed" drugs within this residence and the entire proof is contrary to the defendant's assertion in his written statement provided in the presentence report that states, "[I] did not control what may have been going on at the residence." It is obvious to the Court that defendant has yet to accept the responsibility of his actions which led to these large quantities of drugs and weapons being present within the Nashville community.

(Emphasis added). We conclude that the record does not preponderate against the trial court's finding that Defendant's record of criminal activity was extensive, and he was an appropriate candidate for partial consecutive sentencing. This Court has held that "[p]rior criminal activity does not require prior convictions; prior criminal behavior is sufficient." *State v. William Lewis Houston*, M1999-01430-CCA-R3-CD, 2000 WL 1793088 (Tenn. Crim. App. Dec. 7, 2000) *perm. app. denied* (Tenn. May 7, 2001)(citation omitted). Defendant's participation in an illegal drug operation that lasted over a year, his prior admitted drug use, and his lack of credibility and failure to accept responsibility for his actions reflect negatively on his potential for rehabilitation. *See e.g. State v. Turner*, 41 S.W.3d 663, 676 (Tenn. Crim. App. 2000)("Turner's violent actions and failure to accept full responsibility for those actions indicates that he poses a continuing threat to the public."); *State v. Joseph Antonio Hough*, No. E2000-02728-CCA-R3-CD, 2002 WL 1483203 at *9 (Tenn. Crim. App. July 11, 2002) *perm. app. denied* (Tenn. Dec. 9, 2002)("Considering the appellant's vast history of drug sales, his obvious lack of remorse for the crimes committed, and his high likelihood of repeated criminal behavior, we conclude that the trial court did not err in imposing consecutive sentences); *State v. Antonio M. Byrd*, No. 02C01-9508-CR-00232, 1997 WL 1235 at*26 (Tenn. Crim. App. Jan. 2, 1997) *perm. app. denied* (Tenn. Sept. 22, 1997)(In the context of considering whether defendant was a dangerous offender, "[t]he failure to accept any responsibility shows an absence of rehabilitative qualities and demonstrates the necessity for societal protection by lengthy incarceration). Therefore,

partial consecutive sentencing in this case is congruent with the principles of sentencing, had the convictions not been reversed.

## CONCLUSION

For the foregoing reasons, the judgments of conviction are reversed. The case is remanded to the trial court for proceedings consistent with this opinion.

_____
THOMAS T. WOODALL, JUDGE