IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 13, 2015

**STATE OF TENNESSEE v. JOHN HENRY PRUITT**

**Appeal from the Circuit Court for Hickman County**
**No. 11-5005-CR      Timothy L. Easter, Judge**

**No. M2013-02393-CCA-R3-CD - Filed August 26, 2015**

A Hickman County jury found the Defendant, John Henry Pruitt, guilty of two counts of first degree murder, one count of attempted first degree murder, and three counts of aggravated assault. Thereafter, the jury sentenced the Defendant to life imprisonment without the possibility of parole for both the first degree murder convictions. The trial court imposed a consecutive sentence of twenty-five years for his attempted first degree murder conviction and concurrent six-year sentences for each of the three aggravated assault convictions. On appeal, the Defendant contends that the trial court erred when it denied his motion to suppress the evidence obtained during the execution of a search warrant. The Defendant also contends that the evidence is insufficient to sustain his convictions for first degree murder and attempted first degree murder, and that the evidence is insufficient to sustain his sentence of life without the possibility of parole. After a thorough review of the record and relevant law, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Vanessa Pettigrew Bryan, District Public Defender; J. Gregory Burlison and Robert Jones, Assistant Public Defenders, Franklin, Tennessee, for the appellant, John Henry Pruitt.

Herbert H. Slatery III, Attorney General and Reporter; Michael M. Stahl, Assistant Attorney General; Kim Helper, District Attorney General; Michael J. Fahey and Kate Yeager, Assistant District Attorneys General for the appellee, State of Tennessee.

**OPINION**

# I. Background and Facts

This case arises from the shooting of three victims, Amber Hopkins, John Luster, and James Kennedy, outside the Defendant's residence in Hickman County, Tennessee. Ms. Hopkins and Mr. Luster died from their injuries. A Hickman County grand jury indicted the Defendant with two counts of first degree premeditated murder, one count of attempted first degree murder, and three counts of aggravated assault. The Defendant filed a motion to suppress the evidence obtained during the execution of a search warrant on his residence.

## A. Motion to Suppress

The trial court held a hearing on the motion to suppress the evidence obtained during the search of the Defendant's residence, and the parties presented the following evidence: Scott Smith testified that he had been employed by the Hickman County Sheriff's Department for five years. He recalled an investigation of a homicide that took place on October 18, 2010. He testified that he filled out an affidavit in support of a search warrant for the Defendant's residence and that he signed it on October 18, 2010.

Officer Smith testified about the sequence of events surrounding his procurement of the search warrant, which he later executed on the Defendant's residence. On October 18, 2010, Officer Smith left the Defendant's residence on Nine Mile Ridge Road and drove the six or seven miles back to the Hickman County Justice Center. Once there, he prepared the Affidavit in his office and then e-mailed it to District Attorney Kim Helper, who reviewed it and approved it. Officer Smith then met with the Magistrate, and they reviewed the Affidavit together. After finding probable cause, the Magistrate "signed the search warrant itself" at 11:53 p.m. on October 18, 2010. Officer Smith acknowledged that "another date was listed on the warrant," October 19, 2010, for which he gave the following explanation:

> [T]here might have been a short discussion in between the time that [the Magistrate] issued it and then she signed it, and what order she signed it I don't remember, so she may have issued it on the 18[th]. There might have been a short conversation. It might have become [midnight on] the 19[th] and then she signed it.

Officer Smith stated that "it was so close to midnight . . . when we signed the [warrant] that it could have been the 19[th] and [the Magistrate's] time piece could have been off by several minutes." He reiterated that his swearing of the affidavit and the Magistrate's signing of the search warrant "all took place" within a few minutes before or after midnight of October 19, 2010.

2

Officer Smith testified that, "immediately following the signing of the search warrant," he called the officers at the Defendant's residence and told them to immediately execute the search warrant. As a result of the search of the Defendant's residence, a box of "Fiocchi" pistol bullets was recovered. During the execution of the search warrant, investigators observed a shotgun inside the Defendant's residence. Officer Smith explained that, because a pistol had been recovered from the Defendant, investigators "didn't believe that the shotgun was part of the case so [they] left it in the residence." Tennessee Bureau of Investigation ("TBI") agents obtained a search warrant waiver from the Defendant and later retrieved the shotgun from the Defendant's sister. Officer Smith explained:

> Later when we were interviewing witnesses that were passing by the [Defendant's] residence they stated – one of the witnesses, I believe, stated that they saw a shotgun on [the Defendant's] shoulder so that's when we realized that the shotgun might be a part of this case and that's when the . . . waiver was prepared and we collected it from [the Defendant's] sister . . . .

Officer Smith testified that investigators did not go back inside the Defendant's home after the initial search on October 19, 2010.

On cross-examination, Officer Smith testified that the "confusion" over the date on the search warrant could be explained by the fact that the Magistrate signed it close to midnight. He also stated that the Magistrate might have written down the wrong date.

Officer Smith testified that the box of bullets seized from the Defendant's residence was not a "complete box" and had bullets missing from the box. Officer Smith stated that no "suicide notes or threatening notes" were found during the search of the residence but that, the following day, the Defendant's sister was on the news and "held up a suicide note" that "had been taken out of the [Defendant's] house prior to the officers' arrival . . . ." Officer Smith asked the Defendant's sister for the shotgun and gave her a receipt to indicate that police had possession of the weapon. He reiterated that he did not retrieve the shotgun from the Defendant's house.

On redirect-examination, Officer Smith clarified that the search warrant was not executed on the Defendant's house until after the Magistrate signed it. Officer Smith made the telephone call to the officers at the scene sometime after 11:53 p.m. on October 18, 2010. He stated that the discrepancy in the date on the affidavit and the search warrant could have been caused by his wrist watch reading earlier than the Magistrate's. Officer Smith stated that there was no doubt that the reading and signing of the warrant occurred before the telephone call to the officers at the scene.

3

After recounting the evidence presented at the suppression hearing, the trial court made the following findings as to the erroneously listed dates on the search warrant and in support of denial of the Defendant's motion:

> I do find that in the four corners of the search warrant that there is probable cause to engage the search, but the real issue is the issuance question under the [Tennessee Rules of Criminal Procedure], and [defense counsel] is absolutely right in that the courts hold strictly that [] those rules must be applied very strictly.
>
> . . . .
>
> . . . I do find that this is a procedural issue in that [T.C.A. §] 40-6-108 makes it very clear that the evidence will not be suppressed because of a technical violation of [Tenn. R. Crim. P. 41] as long as its not a violation of the Constitution of the United States or the Constitution of Tennessee.
>
> So I do find that this is a procedural issue under the issuance question . . . whether [the warrant was issued on] the 19th or the 18th. I do find that it's a procedural issue in that [§] 40-6-108 under the Exclusionary Rule Reform Act allows for the admittance of the evidence.
>
> So I do find that the motion to suppress the evidence from the search warrant should be denied, and it's mainly because of [§] 40-6-108 . . . .

### B. Trial

At the Defendant's trial, the following evidence was presented: Belinda Conley testified that she was the mother of one of the victims, Ms. Hopkins, and she had known the Defendant for about a year leading up to the crimes. She testified that she was initially not aware of a relationship between Ms. Hopkins and the Defendant but later learned that they had been dating and living together for a little over a year. She said they lived on Nine Mile Ridge Road on a portion of the unpaved road. Ms. Conley stated that they did not have neighbors living close to them.

Ms. Conley testified that Ms. Hopkins had three children. Ms. Conley recalled that, the day before the shooting, Ms. Hopkins's daughter was injured in a four-wheeling accident and taken to the emergency room by Ms. Hopkins's friend, Mr. Kennedy. Ms. Conley waited for Ms. Hopkins, Mr. Kennedy, and her daughter to return from the hospital, and while she waited, the Defendant arrived at her house. He took a shower at her house because the

4

Defendant and Ms. Hopkins did not have running water at their house. After the Defendant's shower, Ms. Hopkins and her daughter arrived home from the hospital and the Defendant appeared to be "upset" with Ms. Hopkins. He left, and several hours later Ms. Hopkins left with Mr. Kennedy.

Ms. Conley testified that, on the following day, October 18, 2010, the Defendant called her several times looking for Ms. Hopkins and asking when she was going to pick up her things from the Defendant's house. Ms. Conley stated that she told the Defendant that Ms. Hopkins would be coming to his house around 6:30 p.m., when Mr. Kennedy finished work for the day. At approximately 7:10 p.m. the same evening, the Defendant called Ms. Conley and said, "They're all dead," and "I'm sorry."

Demetria Wilson testified that she was a dispatcher for Hickman County on October 18, 2010, and that she received a call about a shooting that day. A man called and said that, "three people had come into his house and that he shot them. He said that one was dead and he wasn't sure about the other two." The man identified himself as the Defendant and told her that he lived on Nine Mile Ridge Road. Ms. Wilson recalled giving instructions to the Defendant during the telephone call, but the Defendant did not have a reaction to her instructions, like "he was [] in his own little world."

The Defendant's 911 call was played for the jury. On cross-examination, Ms. Wilson agreed that another telephone call came in reporting the shooting while she was on the call with the Defendant. She stated that she dispatched emergency assistance to the location the Defendant provided.

Jody Simmons testified that he worked for the Hickman County Sheriff's Department and responded to a call at a house on Nine Mile Ridge Road on October 18, 2010. The house was in a rural area, so Officer Simmons was escorted to the scene by the Defendant's sister. When he arrived at the house, Officer Simmons observed a black Dodge truck on the side of the road with its doors open. He also observed "some bodies lying on the ground in the yard." Officer Simmons identified photographs of the scene, including one of the Defendant's trailer. Officer Simmons testified that the Defendant was standing on the porch of his trailer with a handgun. Officer Simmons notified dispatch that the Defendant had a gun and then exited his police vehicle but remained behind his driver's side door for protection. He then ordered the Defendant to drop his weapon. The Defendant began walking toward him saying, "I'm not going to prison." Officer Simmons responded, "Let's talk about it, just drop the gun." Officer Simmons stated that, as the Defendant walked toward him, he felt fearful but was trying to take control of the situation without firing his weapon.

Officer Simmons testified that Deputy Ricky Harness arrived at the scene and both officers continued to give verbal commands for the Defendant to drop his weapon. Officer Simmons unsuccessfully attempted to shoot the Defendant with a taser. A third officer, Johnny Davis, arrived at the scene and joined the other officers in trying to disarm the Defendant. Officer Simmons testified that it was a matter of minutes from the time he arrived at the scene to when Officer Davis arrived. As all three officers were commanding the Defendant to put down his weapon, the Defendant knelt down on his knees and made a comment about "going back in the house[.]" As the Defendant stood up, "his handgun went like in a forward motion" toward the officers. Officer Davis then shot the Defendant in the right arm. Officer Simmons also shot the Defendant three times in the chest or stomach area. After being shot, the Defendant fell onto his back, and, at that point, "his sister [got] the handgun." Deputy Harness and Officer Davis took the gun from her.

Emergency medical personnel transported the victim who was alive to the hospital, and the other two deceased victims were left at the scene. Other detectives and TBI agents arrived after the scene had been secured.

Deputy Ricky Harness testified that he worked for the Hickman County Sheriff's Department and that he responded to a call at around 7:30 p.m. on October 18, 2010, on Nine Mile Ridge Road. When he arrived at the scene, he saw Officer Simmons giving verbal commands to the Defendant. He stated that the Defendant had a handgun in his right hand and that Officer Simmons tried to taser the Defendant. The Defendant was "pacing back and forth" as the officers were giving him commands, and he walked within twelve to fifteen feet from them with his weapon. Deputy Harness was "afraid [the Defendant] was going to shoot [them] . . . ."

Deputy Harness remembered the Defendant saying, "I killed them," and, when commanded to put his handgun down, he responded, "I'm not putting it down." He recalled seeing the Defendant raise his weapon, and Deputy Harness told Officer Davis to "take a shot." He stated that Officer Davis shot the Defendant in the arm, and Officer Simmons shot the Defendant three times. All of Officer Simmons's shots hit the Defendant and then his sister ran over and grabbed the Defendant's gun. Deputy Harness helped to secure the scene until other officers arrived.

On cross-examination, Deputy Harness testified that the Defendant was standing on his front porch with a gun in his hand when Deputy Harness arrived. He agreed that the Defendant never fired a shot.

Johnny Davis testified that he worked for the Hickman County Sheriff's Department and responded to an incident on Nine Mile Ridge Road on October 18, 2010, at

6

approximately 7:30 p.m.  He testified that he was familiar with the Defendant because he had once returned a pistol to the Defendant that had been stolen from the Defendant's home.

Officer Davis stated that when he arrived at the scene he first encountered a woman who was yelling at him.  He stated that Officer Simmons and Deputy Harness were standing facing the Defendant and that the Defendant was kneeling down in the driveway.  Officer Davis described the scene as follows:

> When I walked up I was hollering at [the Defendant], telling him to drop the weapon.  I hollered all the way from the car up to where he was at, telling him, "John, drop the weapon, drop the weapon."  I [] couldn't tell you how many times I told him, several.  And when I walked up I kept directing him to drop the weapon and he wouldn't drop it.  And I finally asked him, I said, "John, don't you remember me?" And he said, "Yes, sir."  And he said, "You're the man who brought me this weapon and you're the man that's going to have to kill me with it."  And at that time, he stood up and took about two steps back and he started up with the weapon and I shot him right in the hand – right in the arm there.

Officer Davis stated that the Defendant dropped his weapon and then attempted to pick it up again, and then Officer Simmons shot him three times.  Officer Davis identified a photograph of the Defendant's weapon, a Colt .380 pistol.  He turned the weapon over to TBI agents when they arrived at the scene.

Tony Essary testified that he worked as a paramedic for the Hickman County Ambulance Service and that he was working the night of October 18, 2010.  He was called to the scene of this incident and arrived at about 7:45 p.m.  Mr. Essary stated that he attended to the victims, two males and one female, all lying in the yard or the road outside the Defendant's house.  He checked for signs of life on the first male victim and found none, so he confirmed the victim's death.  The female victim did not show any signs of life.  He then helped his co-workers treat the other male victim who had a gunshot wound under his right arm into the side of his chest.  He stated that this victim was conscious and told the paramedics that he could not move his legs.

Dr. Bridget Eutenier testified that she worked for Medical Management Services, the county medical examiner's office for Davidson County.  Dr. Eutenier testified as an expert in the fields of forensic pathology and autopsy.  She testified that her office performed an autopsy on Johnny Luster in October 2010 but that she herself did not perform the autopsy.  Dr. Eutenier testified that she had reviewed the autopsy reports and that Mr. Luster's cause of death was a gunshot wound to the torso.  She identified the bullet removed from Mr.

Luster's body.

Dr. Eutenier testified that her office also conducted an autopsy on Ms. Hopkins's body. She stated that Ms. Hopkins's cause of death was two gunshot wounds to the torso. One of the bullets went into Ms. Hopkins's spine. Dr. Eutenier identified two bullets that were recovered from Ms. Hopkins's body. She stated that the manner of death was homicide.

On cross-examination, Dr. Eutenier testified that Mr. Luster had a blood alcohol level of 1.84 grams per deciliter.

Scott Smith testified that he was the chief deputy of the Hickman County Sheriff's Department and was called to an incident on Nine Mile Ridge Road on October 18, 2010. Deputy Smith stated that, when he arrived at the crime scene on October 18, the ambulance was leaving with the victim who was alive and the two deceased victims' bodies remained at the scene. Deputy Smith searched the Defendant's property for evidence and collected a pistol from Officer Davis. Pursuant to a search warrant, bullets were seized from the Defendant's residence. Deputy Smith testified that the bullets were .380 caliber. Deputy Smith identified shell casings found in the Defendant's yard, as well as a photograph of a bullet hole in Mr. Kennedy's Dodge truck and additional items belonging to the victims found at the scene.

Deputy Smith confirmed that a double barrel shotgun was found inside the Defendant's residence when the search warrant was executed. He stated that, because the Defendant had been seen by the police holding a pistol, and no one had mentioned anything about a shotgun, investigators did not think the shotgun was involved in the crime. Deputy Smith stated that the shell casings found in the yard matched the pistol used during the crime. Later, through witness statements, investigators learned that the Defendant had been seen with a shotgun leading up to the crime, so the shotgun was recovered from the Defendant's sister. Deputy Smith reiterated that four .380 caliber shell casings were recovered from the Defendant's yard. He confirmed that this was the same caliber of the pistol Office Davis and Officer Simmons recovered from the Defendant.

Mike Cox testified that he was a special agent assigned to the TBI Criminal Intelligence Unit in Nashville. He stated that he was assigned to Hickman County in October of 2010 and that he was called out to Nine Mile Ridge Road at 9:15 p.m. on October 18, in response to the shooting. He testified that two simultaneous investigations of the scene were being conducted: one of the homicide and one of the officers involved in shooting the Defendant. Special Agent Vance Jack was assigned to investigate the officers' shooting the Defendant, and Special Agent Cox was assigned to investigate the homicide. Agent Cox's investigation included the entirety of the Defendant's front yard.

8

Special Agent Cox testified that he interviewed the Defendant and that Special Agent Jack was also present. The interview took place at Vanderbilt University Medical Center on October 21, 2010. The agents read *Miranda* warnings to the Defendant inside his hospital room. An audio recording of the Defendant's interview was played for the jury. In the recording, the Defendant acknowledged that he waived his rights. The Defendant stated that the morning of October 18, he was working on his truck with his brother-in-law. He stated that he had Ms. Hopkins's daughter there, and she left to ride a four-wheeler. When Ms. Hopkins's daughter did not return, the Defendant called Ms. Hopkins, who told him that she was with her daughter at the hospital because the daughter had been in an accident on the four-wheeler in "Honda Hills." The Defendant said that he knew this was a lie. Ms. Hopkins told the Defendant to "set all of her stuff" outside of his house because she was going to "move back in" with Mr. Kennedy. The Defendant told Ms. Hopkins to come pick up her stuff, but she "wanted to wait til dark" to come get it. When Ms. Hopkins came with Mr. Kennedy to pick up her things, the Defendant was in his front yard with a gun. Mr. Kennedy "got cussin," and, when he reached for the Defendant, the Defendant shot him. The Defendant stated that the gun he was carrying was a .380 pistol. He said that the shotgun was inside the house. Ms. Hopkins and Mr. Luster were behind Mr. Kennedy, and the Defendant "panicked" and shot them too. He stated that he "didn't shoot to kill" either of them and that he felt bad they had died. He stated that he shot Mr. Kennedy "point blank." The Defendant said he thought he was shooting Ms. Hopkins and Mr. Luster in the leg but that he could not tell where he was shooting them because it was dark. After the Defendant shot the victims, he ran back to his house.

The Defendant stated that he had taken three Loritab pills that day and had drunk several beers throughout the day. He agreed that he was not drunk or intoxicated. He also stated that he takes three Xanax per day because he is "nervous." The Defendant stated that he had been diagnosed with mental health conditions in the 1980's but could not remember his doctor's name.

The Defendant stated that after the shooting he called his sister and told her that the victims had "jumped on [him]" and that he did not know what to do. He told his sister that the victims were dead. The Defendant also called Ms. Conley and told her what had happened. He also called 911 and told them he had "some people in the yard." The Defendant stated that when the police arrived, he wanted to die. He agreed that he refused to drop the gun but stated that he did not point his gun at police. He was holding the gun and facing the police when they shot him. The Defendant stated that everything went blank after he was shot. He agreed that he was holding the gun in his right hand when the police shot his right arm. The Defendant also agreed that the police commanded him to drop his gun. He agreed that he recognized Officer Davis in his yard commanding him to drop his gun.

9

The Defendant stated that he had never seen Mr. Kennedy before the shooting, and he had seen Mr. Luster once. The Defendant stated that he would sign a waiver allowing the police to get the shotgun from his sister. He stated that he had "no problem" with the police getting the shotgun.

The Defendant stated that the victims did not have a weapon but that their physical presence threatened him. The Defendant stated that one of the victims said he would "cut" the Defendant, and the Defendant said he would shoot the victim. He stated that a pocketknife found near his house belonged to him.

Dan Royse testified that he worked for the TBI and was admitted as an expert in the field of ballistics and firearm identification. Agent Royse identified a .380 automatic bullet magazine, a .380 "auto semi-automatic pistol," and "three fired .380 auto bullets" that were submitted to him by Deputy Smith for analysis in connection with this case. Agent Royse testified that through TBI ballistics testing procedures he was able to determine that the bullets had been fired from the .380 caliber pistol.

Agent Royse identified the clothing worn by Mr. Luster on which he performed a "muzzle-to-garment distance determination." He testified that he examined Mr. Luster's clothing for gunpowder and lead residues, which, if present on the clothing, would indicate the distance of the firearm from the article of clothing. He testified that the bullet hole in Mr. Luster's shirt did not have "nitrates, . . . a product of burned . . . gunpowder." Agent Royse stated that he did not find the presence of lead vapor on Mr. Luster's shirt either. He stated that typically those chemicals would be present on the clothing if a firearm had been discharged within a five-foot range.

Agent Royse testified that he performed the same test on Ms. Hopkins's pants. A bullet hole in the waistband of the pants did not reveal any nitrates present or other chemicals consistent with a weapon being fired at close range. Agent Rouse also tested Mr. Kennedy's shirt which had two bullet holes in it. Agent Royse did not find any evidence of gunpowder on Mr. Kennedy's shirt that would be "expected" if the gun had been fired within five feet of Mr. Kennedy.

James Kennedy, the surviving victim in this case, testified that he lived in Maury County, Tennessee, on the Hickman County line. He stated that in October 2010, he had been working at Moody's Tire and Auto Service in Franklin, Tennessee, for three months.

Mr. Kennedy testified that he knew Ms. Hopkins and that they had dated when they were teenagers. He stated that they were "friends with benefits" in the time leading up to October 18, 2010. He agreed that this meant he was in a sexual relationship with Ms.

Hopkins. Mr. Kennedy testified that Ms. Hopkins was living "on Nine Mile Ridge Road," but stated that she stayed with Mr. Kennedy for about a week in the month leading up to October 18, 2010. After she stayed with Mr. Kennedy, Ms. Hopkins "moved back in" with the Defendant.

Mr. Kennedy testified that, in an area near his home called "Honda Hills," people would often ride their four-wheelers and trucks around through the mud. He stated that he, Ms. Hopkins, and Ms. Hopkins's daughter[1] went to Honda Hills on October 17, 2010, and Ms. Hopkins's daughter fell off a four-wheeler and broke her wrist. Mr. Kennedy took her to the hospital and then dropped her off at Ms. Conley's house. Mr. Kennedy stated that the Defendant was at Ms. Conley's house when he dropped off Ms. Hopkins's daughter there. They did not "have bad words," and the Defendant thanked Mr. Kennedy for bringing Ms. Hopkins's daughter home. Mr. Kennedy testified that the Defendant and Ms. Hopkins started talking, and the Defendant "got mad" and left. Mr. Kennedy and Ms. Hopkins then left Ms. Conley's house and stayed overnight at Mr. Kennedy's house.

Mr. Kennedy testified that he went to work at about 5:30 a.m. on October 18, 2010, and Ms. Hopkins stayed at his house. He stated that he saw his co-worker, Mr. Luster, at work that day. Mr. Kennedy stated he worked until noon on October 18 and that Mr. Luster was still working when he left. Mr. Kennedy drove home and picked up Ms. Hopkins, and they went to Columbia, Tennessee. When Mr. Kennedy and Ms. Hopkins returned to Mr. Kennedy's house that evening around 6:00 p.m., Mr. Luster was waiting for them. After about twenty minutes, Mr. Kennedy, Mr. Luster, and Ms. Hopkins left to get Ms. Hopkins's belongings from the Defendant's house. Mr. Kennedy stated that he had not had any alcohol to drink that day and that Mr. Luster was drinking a beer when he got into Mr. Kennedy's truck.

Mr. Kennedy drove to the Defendant's house on Nine Mile Ridge Road, parked his truck in the driveway, and he got out of the driver's side door. Mr. Luster got out of the passenger's side door, and Ms. Hopkins stayed in the truck. Both men walked to the rear of the truck next to the tailgate. Mr. Kennedy retrieved a bucket of Ms. Hopkins's belongings from "the bank" of the driveway and placed it in the bed of his truck. At some point while loading Ms. Hopkins's belongings into his truck, Mr. Kennedy noticed the Defendant and that he had a "rifle on his shoulder and a pistol in his hand." Mr. Kennedy shouted, "He got a gun," and then "I heard a bunch of shots and that was it; I was on the ground." Mr. Kennedy was standing on the back of his truck and was shot under his right arm. He fell

---

[1]Mr. Kennedy testified that the injured child was Ms. Hopkins's niece, however, Ms. Conley testified that it was Ms. Hopkins's daughter. For the purposes of consistency, we will refer to the child as Ms. Hopkins's daughter throughout the opinion.

11

onto the ground by the driver's side of his truck. Mr. Kennedy pulled himself up off the ground and screamed Mr. Luster's name. He saw Ms. Hopkins lying in the seat of his truck before he fell back to the ground. Mr. Kennedy said he could not feel his legs.

Mr. Kennedy testified that, while he was on the ground, the Defendant walked over to him and put the shotgun up to Mr. Kennedy's head and told him to "get up." Mr. Kennedy replied that he couldn't get up, and the Defendant told him to move to the front of the truck, Mr. Kennedy complied and then laid down again on his back. Mr. Kennedy heard Ms. Hopkins repeatedly tell the Defendant not to touch her. Mr. Kennedy stated:

> And I guess [the Defendant] drug her out of the truck, because I heard a thump hit the ground, and I raised up and looked. . . . At the time she was rolled over the other way; she was on her back. Rolled over, she looked at me, and she said, "I'm sorry." And that was it, that's all I heard from her.
>
> . . . .
>
> And then [the Defendant] went back around the side of the truck, went to his house and he got on the phone, and I heard him calling the police, calling the ambulance, whatever, saying that he just shot three people, that they need to send somebody quick.

Mr. Kennedy "begged for [his] life" saying, "Look, please don't kill me . . . . I got two kids." At that point Mr. Kennedy passed out.

Mr. Kennedy testified that he was paralyzed from the waist down as a result of his injuries. He stated that the bullet could not be removed from his body because of the risk of further paralysis, so the bullet remained in his spine. He stated that he did not threaten the Defendant on the night of October 18, 2010, and he did not have any weapons with him. He stated that neither Mr. Luster nor Ms. Hopkins were carrying a weapon that night.

On cross-examination, Mr. Kennedy testified the Defendant was not wearing glasses at the time of the shooting. He stated that he heard the Defendant say to Ms. Hopkins, "Please don't die on me."

Billy Hannah testified that he was the Defendant's brother-in-law and that he got a telephone call at 7:00 p.m. on October 18, 2010, about an incident at the Defendant's home. Mr. Hannah testified that the police did not know how to get to the residence, so he and his wife, the Defendant's sister, escorted them to the residence. When they arrived at the Defendant's home, Mr. Hannah and his wife got out of their vehicle to talk to the Defendant.

12

The Defendant was standing on his porch, and, as police officers arrived at the scene, Ms. Hannah tried to convince the Defendant to put down his gun. At some point, the police officers shot the Defendant several times, and Ms. Hannah picked up his gun. Mr. Hannah stated that the Defendant was "very upset" when they arrived at his house. After the Defendant stepped off of his porch, he made a statement about his gun having one bullet in it and that he "planned on using it on himself[.]"

On cross-examination, Mr. Hannah agreed that the police officers repeatedly told the Defendant to drop his gun, and he would not comply but kept walking closer to the officers.

Mary Hannah, the Defendant's sister, testified that she partially raised the Defendant and that he was a "good child." She stated that the Defendant had always been healthy but that he was having problems "with his head," which she described as "nervous problems." She stated that he lost his job and could not pay his bills. He became depressed and was put on medication for depression. Ms. Hannah stated that the Defendant's doctor told her that the antidepressant medication had "done something to his brain." Ms. Hannah testified that the Defendant could not see well and that he could not afford glasses.

Ms. Hannah testified that the Defendant called her on October 18, 2010. By the tone in his voice, Ms. Hannah could tell the Defendant was scared, so she and her husband went over to his house on Nine Mile Ridge Road. They first met with the police at the end of the road and showed them how to get to the Defendant's home. When Ms. Hannah pulled into the Defendant's driveway, he came out of his house with a gun to his head. Ms. Hannah tried to grab the gun away from the Defendant by pulling on his arm. The Defendant pushed her away and stepped off the porch toward the officers in the yard. Ms. Hannah put herself between the Defendant and the officers and remained there. She stated that she saw the officers shoot the Defendant. Ms. Hannah then picked up the gun, and an officer took it from her.

On cross-examination, Ms. Hannah agreed that she went to the Defendant's house and got the shotgun.

Casey Clemmons testified by video deposition. She stated that on October 18, 2010, she was driving down Nine Mile Ridge Road on her way to work at around 6:00 or 7:00 p.m. She recalled passing the Defendant's house and seeing some "stuff" piled up next to the road and "a guy" in the Defendant's yard. She agreed that she later gave a statement to Officer Smith about what she had seen and that her statement was more accurate than her testimony because of the amount of time that had passed since that day. She agreed that, in her statement, she said that two white males were standing in the Defendant's yard and that one of the men was "yelling at the older white male[.]"

13

Based on this evidence, the jury convicted the Defendant of two counts of first degree premeditated murder, one count of attempted first degree premeditated murder, and three counts of aggravated assault.

A sentencing hearing was held, during which the following evidence was presented: Evelyn Phelps testified that she was Mr. Luster's mother and that he was thirty-two years old when he died. She stated that Mr. Luster had a nine-year-old son, who since his death, asked about his dad everyday and cried everyday about his father's death. Mr. Luster's son had been attending grief counseling. Ms. Phelps said that her son's death had taken a toll on her family.

Rebecca Barnett testified that she was a mitigation specialist working on the defense team representing the Defendant. Ms. Barnett testified to the Defendant's childhood and family background. She stated that the Defendant was married and tried to commit suicide when he and his wife divorced in 1985. She stated that the Defendant was "a nervous person" with issues of depression. Ms. Barnett testified that the Defendant's son had died in a four-wheeling accident. He was married a second time for seventeen years, and his next long-term relationship was with Ms. Hopkins. Ms. Barnett testified that, while in prison awaiting trial, the Defendant was given a psychiatric evaluation and was diagnosed with major depressive disorder with psychotic features.

Ms. Barnett testified that the Defendant had several physical health problems, including heart murmurs and abnormal EKG's. She also stated that he had neurological issues that had not been diagnosed.

Based upon this evidence, the jury sentenced the Defendant to life imprisonment without the possibility of parole for both the first degree murder convictions. The trial court imposed a consecutive sentence of twenty-five years for his attempted first degree murder conviction and concurrent six-year sentences for each of the three aggravated assault convictions. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it denied his motion to suppress the evidence seized as the result of the invalid search warrant. He further contends that the evidence is insufficient to support his convictions for first degree premeditated murder and attempted first degree premeditated murder. Lastly, he contends that the evidence was insufficient for the jury to impose sentences of life without the possibility of parole.

## A. Motion to Suppress

The Defendant contends that the trial court erred when it denied his motion to suppress the box of bullets recovered from his residence and the shotgun recovered from his sister. He contends that search warrant executed on his residence failed to "strictly comply" with Rule 41(c) of the Tennessee Rules of Criminal Procedure because the search warrant listed two dates, October 18 and October 19, 2010. The Defendant argues that this error "renders the warrant itself invalid." The State responds that the requirements of Rule 41(c) were met and the "extraneously listed dates" contained in the warrant "do not cause the warrant to be fatally deficient or outside the technical requirements of 41(c)." The State further contends that "any error in the introduction of the box of [bullets] and shotgun constitutes harmless error as the overwhelming amount of evidence against the [D]efendant in this matter made the introduction of the Fiocchi [box of bullets] and shotgun minor evidentiary pieces."

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

Tennessee Rule of Criminal Procedure 41(c) imposes "procedural safeguards [which] are intended 'to secure the citizens against carelessness and abuse in the issuance and execution of search warrants.'" *State v. Coffee*, 54 S.W.3d 231, 233 (Tenn. 2001) (quoting *Talley v. State*, 345 S.W.2d 867, 869 (1961)). Rule 41(c)(3) of the Tennessee Rules of Criminal Procedure states as follows:

> (3) Content. If the magistrate is satisfied that there is probable cause to believe that grounds for the application exist, the magistrate shall issue a warrant as follows:
>
>> (A) The warrant shall, as the case may be, identify the property or place to be searched, or name or describe the person to be searched; the warrant also shall name or describe the property or

15

person to be seized.

(B) The search warrant shall command the law enforcement officer to search promptly the person or place named and to seize the specified property or person.

(C) The search warrant shall be directed to and served by:

(i) the sheriff or any deputy sheriff of the county where the warrant is issued; or
(ii) any constable or any other law enforcement officer with authority in the county.

(D) The magistrate shall endorse on the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution.

This Court has held that the requirement in Rule 41 "that the date and time of issuance shall be endorsed implicitly means that the *correct* date and time shall be endorsed." *State v. Hayes*, 337 S.W.3d 235, 256 (Tenn. Crim. App. 2010) (emphasis in original). In *Hayes*, the search warrant given to the defendant indicated that it had been issued at 10:35 p.m., however, the copy kept by the judge who signed it indicated 10:35 a.m. *Id.* at 252-53. This Court concluded that the discrepancy on the face of the warrant and its copy violated the "integral purpose of Rule 41," "to ensure that a search warrant is first issued, then executed." *Id.* at 256. Because the search warrant failed to indicate the "*correct* date and time of issuance," it "failed to comply with the requirements of Rule 41" and thus, the trial court's denial of the defendant's motion to suppress was reversed on appeal. *Id.*

In the present case, the affidavit lists one date, October 18, 2010, and the search warrant lists two dates, October 18, 2010, 11:53 p.m., and October 19, 2010. In accordance with this Court's holding in *Hayes* that Tennessee Rule of Criminal Procedure 41 requires that "the correct date and time shall be endorsed," we conclude that the correct date and time were in fact endorsed on the warrant as October 18, 2010, at 11:53 p.m. We agree with the State that the date October 19, 2010, also appears on the warrant but was rendered "extraneous and inapplicable" when the magistrate stated on the warrant that the document was "Issued on Oct. 18, 2010."

We also recognize that Tennessee Code Annotated section 40-6-108 (2014), the Exclusionary Rule Reform Act enacted on July 1, 2011, explicitly states that an "unintentional clerical error" of this nature, made by a police officer or issuing magistrate, does not require

the suppression of evidence seized as a result of executing the search warrant containing the error. *See* T.C.A. § 40-6-108 (a), (c)(1). However, this Court has held that the Act and its procedural changes to Rule 41 "should not be applied retroactively to validate [a] warrant." *State v. Joshua Hayes*, No. M2012-01768-CCA-R3-CD, 2013 WL 3378320, at *5 (Tenn. Crim. App., July 1, 2013). The search warrant in this case was executed in 2010, making the Act inapplicable to the evidence seized during the search.

Further, we agree with the State's contention that the evidence in this case is overwhelmingly sufficient to support the Defendant's convictions irrespective of the bullets seized from the Defendant's home pursuant to the search warrant. We address the sufficiency of the evidence presented in the next section of this opinion. As such, we conclude that even if the trial court had erred in denying the Defendant's motion to suppress the evidence seized pursuant to the search warrant, the error would have been harmless beyond a reasonable doubt. *See* Tenn. R. App. P. 36(b).

As to the Defendant's argument that the shotgun procured by the police from the Defendant's sister should have been suppressed, we agree with the State that the Defendant "voluntarily agreed to have the shotgun taken into evidence" when he signed a "TBI Constitutional Rights to a Search Waiver," and, thus, its seizure was not a violation of the Defendant's constitutional rights. *See State v. Ingram*, 331 S.W.3d 746, 760 (Tenn. 2011) (stating that an "exception to the warrant requirement is that a law enforcement officer may search a person's residence without a warrant if the officer obtains the person's consent) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). The Defendant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient for a rational jury to find beyond a reasonable doubt that he was guilty of two counts of first degree premeditated murder and one count of attempted first degree premeditated murder. He argues that his actions were justified and that the State failed to prove that he did not act in self-defense. The State responds that the evidence is sufficient to sustain his convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial

evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the

convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree premeditated murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2014). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "preexist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2014). Criminal attempt is defined at Tennessee Code Annotated section 39-12-101, which provides in pertinent part that: (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be; (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense. T.C.A. § 39-12-101 (2014).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *State v. Pike*, 978 S.W.2d 904, 915 (Tenn.1998); *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the [defendant] prior to the killing, the [defendant's] prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, considered in the light most favorable to the State, shows that Mr. Kennedy, Mr. Luster, and Ms. Hopkins drove to the Defendant's home on October 18, 2010, and when they arrived, the Defendant came outside into his yard with a gun. Mr. Kennedy stated that neither he nor Mr. Luster were carrying a weapon. Ms. Hopkins remained inside

19

the vehicle while Mr. Luster and Mr. Kennedy got out of the vehicle to load her things. Moments later, the Defendant fired shots at all three victims. Ms. Hopkins and Mr. Luster died from their injuries, and Mr. Kennedy was paralyzed from the waist down as a result of a gunshot wound to his spine. After the shooting, the Defendant called Ms. Hopkins's mother and 911 and told them that he had shot three people. Police officers arrived at the Defendant's home and found him standing in his front yard with a .380 caliber pistol in his hand. TBI testing confirmed that the .380 caliber bullets removed from Ms. Hopkins's and Mr. Luster's bodies were fired from the Defendant's pistol. Of the factors that this Court has acknowledged as tending to prove premeditation, at least two are present here: none of the victims were armed when the Defendant shot them; and, following the shootings, the Defendant exhibited a state of calmness when he called his sister and the police and reported the killings. This evidence is sufficient for a jury to conclude beyond a reasonable doubt that the Defendant was guilty of the first degree premeditated murders of Ms. Hopkins and Mr. Luster and the attempted first degree premeditated murder of Mr. Kennedy.

The Defendant argues that the evidence showed he acted in self-defense, and thus his actions in shooting the three victims were justified. Tennessee's self-defense statute, Tennessee Code Annotated section 39-11-611, provides as follows:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2) (2014). The trial court instructed the jury on the issue of self-defense. It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim .App.1993). It is within a jury's prerogative to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

By its verdict, the jury rejected the Defendant's claim that he acted in self-defense. The jury could have based this rejection on the fact that none of the victims were in possession of a weapon, and, by all accounts, the Defendant was in possession of at least one,

20

if not two. The lack of gunpowder on the victims' clothes indicated that they were shot from a distance of greater than five feet and from that fact, the jury could have concluded that the Defendant and the victims were not in a close-range altercation that required the Defendant to protect himself. We will not disturb the jury's factual finding that the Defendant did not have a reasonable belief that his force was immediately necessary to protect himself. The Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant lastly contends that the evidence was "insufficient as a matter of law for the jury to impose a life sentence without the possibility of parole." He states that the mitigating circumstances, that he was "gainfully employed and [had] avoid[ed] legal trouble for nearly . . . his entire adult life," as well as his anxiety and depression, "overwhelmingly outweighed" the aggravating factor submitted by the State, that the Defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder." T.C.A. § 39-13-204(i)(3) (2014). The State responds that the evidence supports the jury's imposition of the sentence and that the mitigating factors presented by the Defendant did not outweigh the aggravating circumstance. We agree with the State.

Tennessee Code Annotated section 39-13-207 states:

(a) In any first degree murder case in which the state does not seek the death penalty, but is seeking imprisonment for life without possibility of parole as the maximum punishment, should the jury find the defendant guilty of first degree murder, the jury shall fix the punishment in a separate sentencing proceeding, to determine whether the defendant shall be sentenced to imprisonment for life without possibility of parole or imprisonment for life. The sentencing proceeding shall be conducted in accordance with § 39-13-204, excluding references to the death penalty.

(b) If the jury unanimously determines that no statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt, as set forth in § 39-13-204(i), the jury shall return its verdict to the judge on the form described in § 39-13-204(f)(1), and the court shall sentence the defendant to imprisonment for life.

(c) If the jury unanimously determines that the state has proven beyond a reasonable doubt one (1) or more of the statutory aggravating circumstances set forth in § 39-13-204(i), the jury shall, in its considered discretion, sentence the

defendant either to imprisonment for life without possibility of parole or to imprisonment for life.

T.C.A. § 39-13-207(a)-(c) (2014).

In support of mitigation, the Defendant offered evidence that he had suffered anxiety and depression from the death of his son, the loss of his job, as well has two divorces. A mitigation specialist testified that the Defendant had undergone a psychiatric evaluation and had been diagnosed with major depressive disorder with psychotic features during his pretrial incarceration.

At the conclusion of the sentencing hearing, the jury found aggravating factor (3), that the Defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder[,]" applicable to the Defendant and sentenced him to life without the possibility of parole. T.C.A. § 39-13-204(i)(3) (2014). Tennessee Code Annotated section 39-13-207(g) directs that on appeal "[t]he court of criminal appeals shall first consider any errors assigned and then the court shall review the appropriateness of the [Defendant's] sentence. A sentence of imprisonment for life without possibility of parole shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." T.C.A. § 39-13-207(g) (2014). "When considering whether an aggravating circumstance was proved, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *State v. Gaston*, No. W2001-02046-CCA-R3-CD, 2003 WL 261941, at *16 (Tenn. Crim. App., at Jackson, Feb. 7, 2003) (citing *State v. Nesbit*, 978 S.W.2d 872, 887 (Tenn. 1998)), *perm. app. denied* (Tenn. Sept. 2, 2003); *State v. Cazes*, 875 S.W.2d 253 (Tenn. 1994)).

We have reviewed the evidence and conclude that there was sufficient evidence to support the jury finding beyond a reasonable doubt that proof of the aggravating circumstance existed. The jury found beyond a reasonable doubt that the aggravating factor at section 39-13-204(i)(3), that "[t]he defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder[,]" was applicable in this case, and sentenced the Defendant to life without the possibility of parole. *See* T.C.A. § 39-13-204(i)(3). During the act of murdering Mr. Luster, the Defendant knowingly created a risk of death to Ms. Hopkins and Mr. Kennedy. During the act of murdering Ms. Hopkins, the Defendant knowingly created a risk of death to Mr. Luster and Mr. Kennedy. Although Mr. Luster may have been shot first, and ultimately died from his wounds, the jury could have concluded from Dr. Eutenier's testimony that Mr. Luster was still alive when the Defendant

22

was shooting Ms. Hopkins, thus exposing Mr. Luster to a great risk of death by the Defendant's actions in shooting Ms. Hopkins. Further, the Defendant's actions in shooting Ms. Hopkins and Mr. Kennedy certainly prevented either of them from rendering aid to Mr. Luster, who was bleeding to death from a gunshot wound to his abdomen. All three victims were generally in the "line of fire" of the shots fired by the Defendant during these crimes, and all three victims were at great risk of death during the entire incident, in which both Mr. Luster and Ms. Hopkins were murdered. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE